'09 CIV 2191

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAR 1 0 2009

U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, on Behalf of Itself and All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>UBS AG, MARCEL OSPEL, MARCEL ROHNER, PETER WUFFLI, PETER KURER, RAOUL WEIL, MARTIN LIECHTI, MARK BRANSON, PHILIP LOFTS, MARCO SUTER, STEPHAN HAERINGER, ERNESTO BERTARELLI, GABRIELLE KAUFMANN-KOHLER, SERGIO MARCHIONNE, ROLF A. MEYER, HELMUT PANKE, PETER SPUHLER, PETER R. VOSER, LAWRENCE A. WEINBACH, and JOERG WOLLE, )<br><br>Defendants. ) | Civil Action No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Police and Fire Retirement System of the City of Detroit ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by UBS AG ("UBS" or the "Company"), as well as media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the publicly traded securities of UBS between May 4, 2004 and January 26, 2009, inclusive (the "Class Period"), including those purchasing rights and/or common securities pursuant and/or traceable to the Company's false and misleading Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with the Rights Offering approved at the UBS Annual General Meeting on April 23, 2008 (the "2008 Rights Offering"), seeking remedies under the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 (the "1934 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§11 of the 1933 Act and §§10(b), 12(a)(2) and 20(a) of the 1934 Act and SEC Rule 10b-5.  Jurisdiction is conferred by §27 of the 1934 Act and §22 of the 1933 Act.

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and §27 of the 1934 Act and §22 of the 1933 Act.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  UBS conducts business in this District and its common stock trades on the New York Stock Exchange ("NYSE"), which is located in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Police and Fire Retirement System of the City of Detroit, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded securities of UBS at artificially inflated prices during the Class Period, including securities pursuant and/or traceable to the 2008 Rights Offering, and has been damaged thereby.

7.      Defendant UBS provides wealth management, individual banking and investment banking services to customers in the United States and around the world. Based in Zurich, Switzerland, UBS maintains U.S. investment banking offices in Stamford, Connecticut and in New York, New York. UBS has branch offices and subsidiaries in the United States as well as many other countries.

8.      Defendant Marcel Ospel ("Ospel") was the Chairman of the Board of UBS from 2001 to April 23, 2008 and also served as its Group Chief Executive Officer. Defendant Ospel signed or authorized the signing of the false or misleading Registration Statement.

9.      Defendant Marcel Rohner ("Rohner") was appointed Group Chief Executive Officer on July 6, 2007 and Chairman & CEO Investment Bank on October 1, 2007. He became a member of the Group Executive Board in 2002. Between 2002 and 2007, he was CEO of Wealth Management & Business Banking and was named Chairman in 2004. Before that, in 2001 and 2002, he was Chief Operating Officer and Deputy CEO

of the Private Banking unit of UBS Switzerland. In 1999, he was named Group Chief Risk Officer. On February 27, 2009, UBS announced Rohner was stepping down as CEO. Defendant Rohner signed or authorized the signing of the false or misleading Registration Statement.

10.     Defendant Peter Wuffli ("Wuffli") was appointed President of the Group Executive Board of UBS AG in December 2001 and Group Chief Executive Officer in September 2003. Previously, he was Chairman and CEO of UBS Asset Management and, before that, UBS AG Group Chief Financial Officer. Wuffli was replaced as Group Chief Executive Officer by Defendant Rohner on July 6, 2007.

11.     Defendant Peter Kurer ("Kurer") became Chairman of UBS AG on April 23, 2008. He chaired the Corporate Responsibility Committee and the Strategy Committee of UBS AG.  Kurer was appointed Group General Counsel and Member of the Group Managing Board when he joined UBS AG in 2001. In 2002, he was appointed Member of the Executive Board. On March 4, 2009, UBS announced that Kurer will step down as chairman.

12.     Defendant Raoul Weil ("Weil") was the Head of UBS's International Wealth Management division between 2002 and 2007, and was appointed to the Group Executive Board in July 2005. In July 2007, Weil became the Chairman and CEO of Global Wealth Management & Business Banking. On November 12, 2008, following his indictment on charges of conspiracy to commit tax fraud in connection with UBS's cross-border activities, Weil relinquished his duties as Chairman and CEO of Global Wealth Management & Business Banking.

13.     Defendant Martin Liechti ("Liechti") is the Head of UBS's Wealth Management Americas International Division. In April 2008, Liechti was detained by U.S. authorities as a material witness in the U.S. government's investigation into tax evasion by UBS and members of its Global Wealth Management & Business Banking division.

14.     Defendant Mark Branson ("Branson") is the Chief Financial Officer for UBS's Global Wealth Management & Business Banking division. Defendant Branson testified before the United States Senate's Permanent Subcommittee on Investigations (the "Subcommittee") in July 2008 regarding a probe into "Tax Haven Banks and U.S. Tax Compliance."

15.     Defendant Philip Lofts ("Lofts") was appointed as Group Chief Risk Officer in November 2008. Previously, Lofts was the Group Chief Credit Officer at UBS. In 2004, Lofts was appointed to the Group Managing Board. Lofts was the Chief Credit Officer for Asia Pacific from 1998 - 2002 and for the Americas from 2002 - 2003. Prior to 1998, Lofts headed the Structured Finance & Credit Risk Management Division in Japan. Between 1994 and 1996, Lofts was the Deputy Head of the Banking Division in London where he managed both marketing and structuring teams.

16.     Defendant Marco Suter ("Suter") has been the Group Chief Financial Officer of UBS since October 2007.  Defendant Suter signed or authorized the signing of the false or misleading Registration Statement.

17.     Defendant Stephan Haeringer ("Haeringer") is the Executive Vice Chairman and Member of UBS's Board of Directors. Defendant Haeringer signed or authorized the signing of the false or misleading Registration Statement.

18.     Defendant Ernesto Bertarelli ("Bertarelli") has been a Director of UBS since 2002. Bertarelli is a member of the Governance and Nominating Committee and of the Human Resource and Compensation Committee. Defendant Bertarelli signed or authorized the signing of the false or misleading Registration Statement.

19.     Defendant Gabrielle Kaufmann-Kohler ("Kaufmann-Kohler") has been a Director of UBS since 2006. Kaufmann-Kohler chairs the Governance and Nominating Committee and is a member of the Corporate Responsibility Committee. Defendant Kaufmann-Kohler signed or authorized the signing of the false or misleading Registration Statement.

20.     Defendant Sergio Marchionne  ("Marchionne") has been a Director of UBS since 2007. Marchionne is a member of the Governance and Nominating Committee and the Strategy Committee.  Defendant Marchionne signed or authorized the signing of the false or misleading Registration Statement.

21.     Defendant Rolf A. Meyer ("Meyer") was a Director of UBS.  Defendant Meyer signed or authorized the signing of the false or misleading Registration Statement.

22.     Defendant Helmut Panke  ("Panke") has been a Director of UBS since 2004. Panke is a member of the Human Resources and Compenstation Committee and the Risk Committee. Defendant Panke signed or authorized the signing of the false or misleading Registration Statement.

23.     Defendant Peter Spuhler  ("Spuhler") was a Director of UBS.  Defendant Spuhler signed or authorized the signing of the false or misleading Registration Statement.

24.     Defendant Peter R. Voser   ("Voser") has been a Director of UBS since 2005.   Voser is the chair of the Audit Committee and a member of the Strategy Committee.  Defendant Voser signed or authorized the signing of the false or misleading Registration Statement.

25.     Defendant Lawrence A. Weinbach ("Weinbach") was a Director of UBS. Defendant Weinbach signed or authorized the signing of the false or misleading Registration Statement.

26.     Defendant Joerg Wolle ("Wolle") has been a Director of UBS since 2005. Wolle is the chair of the Human Resources and Audit Committee and a member of the Governance and Nominating Committee  Defendant Wolle signed or authorized the signing of the false or misleading Registration Statement.

27.     Defendants Ospel, Rohner, Wuffli, Kurer, Weil, Liechti, Branson and Lofts are referred to herein collectively as the "Individual Defendants."

28.     During the Class Period, the Individual Defendants possessed the power and authority to control the contents of UBS's financial reports, press releases and presentations

to securities analysts, money and portfolio managers and institutional investors.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

29.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of UBS's business.

30.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

31.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to UBS's

financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of UBS's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of UBS's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding UBS's business, operations and management and the intrinsic value of UBS securities; and (ii) caused Plaintiff and members of the Class to purchase UBS's publicly traded securities at artificially inflated prices.

33.     The Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding UBS, their control over, and/or receipt and/or modification of UBS's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning UBS, participated in the fraudulent scheme alleged herein.

34.     Defendant UBS and Defendants Ospel, Rohner, Suter, Haeringer, Bertarelli, Kaufmann-Kohler, Marchionne, Meyer, Panke, Spuhler, Voser, Weinbach, and Wolle,

each of whom signed the Registration Statement, are **strictly liable** for the false and misleading statements incorporated into the Registration Statement.

### CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired UBS common stock during the Class Period (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the common stock of UBS was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by UBS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a) whether the Exchange Act was violated by Defendants as alleged herein;

        (b) whether the 1933 Act was violated by Defendants as alleged herein;

(c) whether statements made by Defendants misrepresented material facts about the business, operations and management of UBS; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

40.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

41.     Defendant UBS is a global provider of financial services for wealthy clients. UBS's financial businesses are organized on a worldwide basis into three Business Groups and the Corporate Center. UBS's Global Wealth Management & Business Banking Group consists of three segments: Wealth Management International & Switzerland, Wealth Management US and Business Banking Switzerland.

42.     According to the Company's website, in relevant part:

> In wealth management, UBS's services are designed for high net worth and affluent individuals around the world, whether investing internationally or in their home country. UBS provides them with tailored, unbiased advice and investment services - ranging from asset management to estate planning and from corporate finance to art banking. Its Swiss retail and corporate banking business provides a complete set of banking and securities services for domestic individual and corporate clients.

43.     According to a staff report from a U.S. Senate Subcommittee, the Wealth Management unit of UBS also had a steady business of assisting wealthy U.S. citizens evade taxes.

44.    The Senate's Permanent Subcommittee on Investigations issued a report concerning "Tax Haven Banks and U.S. Tax Compliance". The report contains several findings regarding UBS, including, in relevant part.

> UBS AG of Switzerland is one of the largest financial institutions in the world, and has one of the largest private banks catering to wealthy individuals. ***From at least 2000 to 2007, UBS made a concerted effort to open accounts in Switzerland for wealthy U.S. clients, employing practices that could facilitate, and have resulted in, tax evasion by U.S. clients.*** These UBS practices included maintaining for an estimated 19,000 U.S. clients 'undeclared' accounts in Switzerland with billions of dollars of assets that have not been disclosed to U.S. tax authorities.
>
> \*        \*        \*
>
> Although UBS signed a QI [Qualified Intermediary] agreement with the U.S. in 2001, UBS has never filed 1099 Forms reporting those accounts to the IRS, contending that these U.S. client accounts fall outside its QI reporting obligations. UBS refers to these accounts internally as 'undeclared accounts'.
>
> (Emphasis added.)

45.    Foreign financial institutions and foreign branches of U.S. financial institutions can enter into an agreement with the IRS to be a qualified intermediary ("QI"). A QI is entitled to certain simplified withholding and reporting rules. In exchange the QI agrees to report information to the IRS on U.S. citizens with accounts at the institution. In addition the QI is required to withhold a percentage of the interest income paid to the account and to file certain tax forms with the IRS.

46.    The Subcommittee's report continues:

> In response to Subcommittee inquiries, UBS has estimated that it today has 20,000 accounts in Switzerland for U.S. clients, of which roughly 1,000 are declared accounts and 19,000 are undeclared accounts that have not been reported to the IRS. UBS also estimates that that those accounts contain assets with a combined value of about $18.2 billion in Swiss francs, or about $17.9 billion.

### UBS's Practices Violated SEC Regulations

47.    Section 15(a)(1) of the Exchange Act prohibits non-U.S. persons from advertising securities products or services or executing securities transactions within the United States, unless registered to do so with the SEC. 15 U.S.C. § 78o(a)(1).

48.    UBS has admitted in a November 2004 Policy Statement on "Cross-Border Banking Activities into the United States," that, although UBS is licensed to operate as a bank and broker-dealer in the United States, those licenses do not extend to its non-U.S. offices or affiliates. The policy statement acknowledges that "UBS AG has several U.S. branches and agencies and various non-banking subsidiaries all properly licensed, but these licenses do not encompass cross-border services provided to U.S. residents by UBS AG offices or affiliates outside the United States.... Any entity outside of the United States that is not registered with the SEC ... may not advertise securities services or products in the United States."

49.    The 2004 UBS policy statement goes on to list specific restrictions on activities that may be undertaken by UBS's non-U.S. personnel while in the United States. These restrictions included the following:

- Advertising and marketing for UBS services going beyond generic information relating to the image of UBS AG and its brand in the U.S.;

- organizing promotional events in the U.S. absent an opinion from the UBS legal department;

- establishing relationships for securities products or services with new clients in the U.S. with the use of U.S. jurisdictional means;

- producing marketing or advertising collateral directly targeting U.S. clients taking place in the U.S.;

- soliciting of account opening taking place in the U.S.;

- cold calling or prospecting in the U.S.;

- negotiating or executing contracts in the U.S.;

- carrying or transporting cash or other valuables out of the U.S. on behalf of U.S. clients;

- routine certification of signatures, transmission of completed account documentation, or related administrative activity on behalf of UBS in the U.S.; and

- Carrying on of substantial activities at fixed locations while in the U.S. by that would thereby establish an office or maintain a place of business.

50.     Directly violating SEC regulations and Company policies, UBS strongly encouraged and incentivized its non-U.S. personnel to attract new business and maintain current accounts in the U.S.

51.     Bradley Birkenfeld, a private banker formerly employed by UBS in the Company's private-banking division, has been cooperating with U.S. investigators since 2007. At first cooperating from Geneva in an attempt to avoid arrest by helping build a case against UBS,  Birkenfeld was ultimately charged for conspiracy to defraud the U.S. government by helping a client evade $7.2 million in taxes on $200 million in assets he had hidden in Switzerland and Liechtenstein. Birkenfeld was facing a jail sentence of five years and a $250,000 fine, but had pledged in a plea agreement to cooperate formally with the U.S. government, promising to tell everything he knew about UBS's offshore private-banking business in exchange for leniency.

52.     Birkenfeld voluntarily provided documentation and testimony to the Senate Subcommittee about a wide range of issues related to UBS business dealings with U.S. clients.

53.     In his testimony before the Subcommittee, Birkenfeld claimed to have been unaware of the restrictions on U.S. dealings by non-U.S. personnel detailed above until a colleague brought them to his attention in May 2005, showing him the 2004 policy statement on UBS's internal computer system. He told the Subcommittee, "When I read it, I was very concerned about what was going on in the bank, because this contradicted entirely what my job description was."

54.     Despite the explicit restrictions on U.S. activities set out in its policy statements, in interviews with the Subcommittee, UBS confirmed that, from at least 2000

to 2007, it routinely authorized and paid for its Swiss bankers to travel to the United States to develop new business and service existing clients.

55.     A 2003 UBS "Action Plan" called for increased client contact "through business trips" to the U.S. and directed Swiss bankers to seek "active referrals from existing clients for new relationships." A 2005 UBS document called for "frequent traveling" and "selective traveling by UBS Swiss bankers to the U.S." as part of the services to be provided to U.S. clientele.

56.     Birkenfeld told the Subcommittee that UBS's non-U.S. personnel with U.S. accounts typically traveled to the U.S. four to six times a year to service existing accounts and prospect for new clients. He noted these personnel included around "25 people in Geneva, 50 people in Zurich and five to ten in Lugano." In Birkenfeld's words:

> This was a massive machine. I had never seen such a large bank making such a dedicated effort to market to the U.S. market. And from my understanding and my work experience in Switzerland, it was the largest bank with the largest number of clients and assets under management of U.S. clients.

57.     Birkenfeld testified that UBS routinely supplied its Swiss bankers with tickets and funds to attend events attended by wealthy U.S. individuals for the purpose of soliciting new business. UBS went so far as to sponsor U.S. events likely to attract wealthy clients, such as the Art Basel Air Fair in Miami; performances in major U.S. cities by the UBS Vervier Orchestra; and U.S. yachting events attended by the elite Swiss yachting team, UBS-sponsored Alinghi.

58.     A UBS document describing marketing strategies to attract U.S. clients confirms that the bank "organized VIP events" and engaged in the "Sponsorship of Major Events" such as "Golf, Tennis Tournaments, Art, Special Events." This document identifies the 25 most affluent housing areas in the United States to provide "targeted locations where to organize events."

59.     The Senate Subcommittee conducted an analysis of more than 500 travel records compiled by the Department of Homeland Security, at the Subcommittee's request, of persons travelling from Switzerland to the United States from 2001 to 2008, in order to identify UBS Swiss bankers who serviced U.S. clients. The Subcommittee determined that, from 2001 to 2008, roughly twenty UBS Swiss client advisors made an aggregate total of over 300 visits to the United States. Only two of these visits took place from 2001 to 2002; the rest occurred from 2003 to 2008. On several occasions, the visits appear to have involved multiple client advisors travelling together to UBS-sponsored events in the United States. Some of these client advisors designated their visits as travel for a non-business purpose on the I-94 Customs Declaration Forms that all visitors must complete prior to entry into the U.S. Closer analysis revealed that the dates and ports of entry for such trips coincided with the UBS-sponsored events, suggesting the visits were, in fact, business-related.

60.     The data revealed specific UBS bankers who regularly visited the U.S.  One UBS employee, for example, travelled to the U.S. three times per year, at roughly four-month intervals, from 2003 to 2007. Another senior UBS Swiss private bank official visited the U.S. nearly every other month for a significant portion of the period examined by the Subcommittee. Defendant Liechti visited the U.S. up to eight times in a year.

61.     These travel records, along with other evidence, demonstrate that UBS engaged in a concerted effort to maintain and recruit U.S. business in the United States through the Company's non-U.S. personnel.

62.     According to the internal UBS report entitled "KeyClients in NAM [North America]: Business Case 2003-2005" states, "31% of Worlds UHNWIs [Ultra High Net Worth Investors] are in North America (USA + Canada)."

63.     Birkenfeld told the Subcommittee that each year his superiors at UBS gave him a specific monetary goal, referred to as a "net new money" ("NNM") target, that he was expected to bring into the bank  from U.S. clients. Birkenfeld also testified that each

"Swiss Client Advisor" who dealt with U.S. clients was given a similar NNM goal, based on their seniority and past performance. Birkenfeld added, "when people aren't paying tax in the three areas I told you - inheritance, income, and capital gains - it's quite easy for people to bring money to you. They're very interested to bring as much money to the bank as possible."

64.     Birkenfeld told the Subcommittee that it was his "job as a private banker … to bring in net new money … probably $50 million a year or $40 million."

65.     An email from Defendant Liechti, UBS's Head of the Wealth Management Americas International division in Switzerland, confirms the bank's focus on NNM:

> Net New Money is, as you know, a key element for our success. This means that we all have to work hard to achieve our NNM goals for 2003 and the years to come. In order to reach this goal, two main initiatives have been launched: The KeyClient initiative and the Referral Program within UBS....
>
> Each Country Team making a referral will get 0.33% of the revenues generated by the Financial Advisor over a time period of four years. As you know, we set, at the beginning of the year, a target of 5 referrals per [Client Advisor] to be made. I am aware that it is a challenge to reach this goal. In acknowledgement of your effort and commitment, I would like to award the Client Advisor in each Country Team who achieves, until the 31st of December 2003, the most referrals (amount of money and number of referrals), but at least the 5 referrals set as a target, with a Breitling wristwatch.

66.     In early 2007, Mr. Liechti sent an email setting a new NNM goal for all of non-U.S. personnel with clients in the "Americas," including the United States. His email states:

> We achieved much in 2006 and I thank you for your huge efforts and dedication to the Americas.
>
> The markets are growing fast, and our competition is catching up. ... The answer to guarantee our future is GROWTH. We have grown from CHF [Swiss Franc] 4 million per Client Advisor in 2004 to 17 million in 2006. We need to keep up with our ambitions and go to 60 million per Client Advisor!

67.    This email indicates that in two years, from 2004 to 2006, UBS Swiss bankers had quadrupled the amount of net new money being drawn into UBS from the "Americas," and that the bank's management sought to quadruple that figure again in a single year, 2007. This email demonstrates the emphasis that UBS placed on bringing in new money from the United States into Switzerland.

**UBS's Practices Violated IRS Regulations**

68.    UBS violated IRS regulations and its QI requirements in the concerted effort to hide the identities of UBS's U.S. clients and to protect the $20 billion in assets those clients invested in undisclosed UBS accounts,

69.    UBS not only opened undeclared Swiss accounts for U.S. clients, UBS assured its U.S. undeclared account clients that U.S. authorities would not learn about them, stating that UBS procedures, practices and services protected against disclosure and that the account information was further shielded by Swiss bank secrecy laws.

70.    For example, in November 2002, UBS sent the following letter to U.S. clients about their Swiss accounts that states in part:

> Dear client:
>
> From our recent conversations we understand that you are concerned that UBS' stance on keeping its U.S. customers' information strictly confidential may have changed especially as a result of the acquisition of Paine Webber. We are writing to reassure you that your fear is unjustified and wish to outline only some of the reasons why the protection of client data can not possibly be compromised upon.
>
> The sharing of customer data with a UBS unit/affiliate located abroad without sufficient customer consent constitutes a violation of Swiss banking secrecy provisions and exposes the bank employee concerned to severe criminal sanctions. Further, we should like to underscore that a Swiss bank which runs afoul of Swiss privacy laws will face sanctions by its Swiss regulator ... up to the revocation of the bank's charter. Already against this background, it must be clear that information relative to your Swiss banking relationship is as safe as ever and that the possibility of putting pressure on our U.S. units does not change anything. Our bank has had offices in the

United States as early as 1939 and has therefore been exposed to the risk of US authorities asserting jurisdiction over assets booked abroad since decades. Please note that our bank has a successful track record of challenging such attempts.

As you are aware of, UBS (as all other major Swiss banks) has asked for and obtained the status of a Qualified Intermediary under U.S. tax laws. The QI regime fully respects client confidentiality as customer information is only disclosed to U.S. tax authorities based on the provision of a W-9 form. Should a customer choose not to execute such a form, the client is barred from investments in US securities but under no circumstances will his/her identity be revealed. Consequently, UBS's entire compliance with its QI obligations does not create the risk that his/her identity be shared with U. S. authorities.

71.    In this letter, UBS clearly indicates that it would not disclose the identity of any U.S. citizen with an undeclared Swiss account as long as the account does not contain any U.S. securities.

72.    This conduct violates U.S. tax laws and UBS's QI Agreement which require that sales of non-U.S. securities must be reported by foreign financial institutions on IRS 1099 Forms.

73.    In order to avoid the reporting regulations for Swiss bank account holdings of U.S. clientele, UBS had a number of specific written policies to avoid reporting transactions in non-U.S. securities. For example, in a 2002 UBS policy guideline, the Company instructed its Swiss bankers to persuade their U.S. clients to enter into a "discretionary asset management relationship" with the bank, but then to "[c]ease to accept customer instructions from US territory" so that no securities trades would be deemed effected in the United States that might require reporting to the IRS.

74.    The 2002 UBS guidelines instruct its non-U.S. personnel to ensure that there is "no use of US mails, e-mail, courier delivery or facsimile regarding the client's securities portfolio"; "no use of telephone calls into the US regarding the client's securities portfolio"; "no account statements, confirmations, performance reports or any other communications" while in the United States; "no further instructions … from …

clients while they are in the US"; "no marketing of advisory or brokerage services regarding securities"; "no discussion of or delivery of documents concerning the client's securities portfolio while on visits in the US"; "no discussion of performance, securities purchased or sold or changes in the investment mandate for the client" while in the United States; and "no delivery of documents regarding performance, securities purchased or sold or changes in the investment mandate for the client."

75.     UBS also advised its clients to structure accounts and transactions so as to avoid QI disclosure, thus completely circumventing the purposes and goals of the QI program.

76.     For example, after UBS informed its clients that the Company had joined the QI program in 2001 and explained its disclosure obligations, many of UBS's U.S. clients elected to sell their U.S. securities or open new accounts to avoid the QI reporting obligations. UBS helped its clients sell over $2 billion in U.S. securities and reinvest in non-U.S. securities, and then to open new accounts despite evidence that these clients were using their Swiss accounts to hide assets from the IRS.

77.     UBS has admitted that in 2001 it helped roughly 250 U.S. clients with Swiss accounts establish corporations, trusts, foundations, or other entities in non-U.S. countries, open UBS accounts in the names of these entities, and then transfer the client's U.S. securities to shell accounts.

78.     UBS continued to maintain accounts for its U.S. clients, despite evidence that the clients were hiding their assets and accounts from the IRS. In this way, UBS employed practices that kept the U.S. clients' accounts secret from the IRS and thereby facilitated tax evasion by the U.S. clients holding undeclared accounts.

79.     The Statement of Facts in the Birkenfeld criminal case characterizes these actions as follows: "By concealing the U.S. clients' ownership and control in the assets held offshore, defendant Birkenfeld, the Swiss Bank, its managers and bankers evaded the

requirements of the Q.I. program, defrauded the IRS and evaded United States income taxes."

80.     The Statement of Facts in the Birkenfeld criminal case describes additional actions taken by UBS bankers to help U.S. clients manage their Swiss accounts without alerting U.S. authorities. It states, for example, that UBS bankers advised U.S. clients to withdraw funds from their accounts using Swiss credit cards that "could not be discovered by United States authorities"; to "destroy all off-shore banking records existing in the United States"; and to "misrepresent the receipt of funds from the Swiss bank account in the United States as loans from the Swiss Bank."

81.     The Statement of Facts also discloses that, on one occasion, "at the request of a U.S. client, Birkenfeld purchased diamonds using that U.S. client's Swiss bank account funds and smuggled the diamonds into the United States in a toothpaste tube," presumably so that the U.S. client could obtain possession of his Swiss assets without alerting U.S. authorities.  It also states that Birkenfeld and a business associate "accepted bundles of checks from U.S. clients and facilitated the deposit of those checks into accounts at the Swiss bank" and elsewhere, presumably to assist the clients in making transfers to their Swiss accounts, again without alerting U.S. authorities.

82.     UBS not only allowed U.S. clients to open undeclared accounts in Switzerland and assured them it would not disclose these accounts unless compelled by law, UBS also took steps to ensure that its Swiss bankers serviced their U.S. clients in ways that minimized disclosure of information to U.S. authorities. These measures included refraining from mailing Swiss account information into the United States, ensuring Swiss bankers traveling to the United States carried minimal or encrypted client account information, and providing training to help its bankers avoid surveillance by U.S. authorities.

83.     Birkenfeld told the Senate Subcommittee that, to his knowledge, almost all U.S. clients with Swiss accounts declined to have their account statements mailed to them

in the United States.  Instead, UBS held client mail in Switzerland until the client was able to view the account documentation in person, after which the information was shredded. He explained:

> You paid 500 francs a year to have all of the statements and all of the transactions held in their folder, sealed, so when they came to the bank, 6 months, a year later, they could come and look at it, go through it, and then we would shred it …. So I've had some clients who would sit there for an hour or two hours, and then they come back and say, 'Okay. Everything's fine.' And they'd give the documents and say, 'You can shred them.' And we'd go and take it in the big shredding room and just shred everything. And then you'd start from zero again.

84.     Birkenfeld said that, in between visits to Switzerland to review their account information, many U.S. clients expected their Swiss banker to visit them in the United States and provide updated information about their accounts. He said that, prior to a business trip in which they planned to meet with specific clients, non-U.S. UBS bankers typically collected and reviewed the relevant client account information. He said that the Swiss bankers did not normally bring the actual account statements with them into the United States, but took elaborate measures to disguise or encrypt client information to prevent it from falling into the wrong hands. He said, for example, some bankers kept "cryptic notes" on each account and took only those notes into the United States.

85.     For example, Birkenfeld described one Swiss banker who directed his assistant to transcribe by hand the information in his clients' account statements onto spreadsheets,  omitting any identifying information other than a code name, and then sent the handwritten spreadsheets by overnight mail to his hotel in the United States, after which he would provide the spreadsheets to his U.S. clients in individual meetings.

86.     UBS supplied its bankers with "TAS" computers, which were programmed to receive only highly encrypted information, and cautioned them to take measures to safeguard their client information when traveling to the U.S.  The TAS computers could

be used to access the client's private bank statements from America and print them out, as well as view and print out product offerings.

87.     UBS cautioned its bankers, when traveling to the United States, to take measures to safeguard client information and supplied the TAS computers that some non-U.S. personnel used.  A 2004 UBS policy statement provides: "When traveling cross-border, UBS AG employees always must remember that all clients of UBS AG expect us to take all necessary steps to safeguard confidentiality. Client advisors are referred to separate guidance on the protection of confidential information and other available resources that may assist."

88.     Birkenfeld revealed that UBS cautioned its Swiss bankers to keep a low profile during their business trips to the United States so they would not attract attention from U.S. authorities. He noted, for example, that UBS business cards did not include a reference to a private banker's involvement in "wealth management." He also said that some UBS Swiss bankers who visited the United States on business told customs officials that they were in the country for "pleasure."

## The False and Defective Registration Statement

89.     On or about April 8, 2008, UBS filed with the SEC the Registration Statement on Form F-3. The Registration Statement incorporated by reference all subsequently filed prospectus supplements. The Company would later issue, on or about May 23, 2008, a prospectus supplement which became part of the Registration Statement.

90.     The Registration Statement, including incorporated statements were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

91.     The Registration Statement was false and defective in that it did not disclose the Company's tax evasion business with its U.S. clients that violated a number of rules and regulations in the U.S. and abroad; thereby concealing a material risk to the Company and its future prospects.

92.     Also incorporated in the Registration Statement are:

(a)     UBS's Annual Report on Form 20-F for the year ended December 31, 2007, which UBS filed with the SEC on March 18, 2008, and the amendment to that report on Form 20-F/A, which UBS filed with the SEC on March 20, 2008;

(b)     UBS's submission on Form 6-K, which submitted to the SEC on April 1, 2008;

(c)     UBS's quarterly report for the first quarter of 2008 on Form 6-K, filed with the SEC May 6, 2008.

93.     On June 13, 2008, UBS announced the success of the offering. Defendants stated, in relevant part:

> UBS AG successfully completes its rights offering
>
> UBS AG has successfully completed its CHF 15.97 billion rights offering, which was approved by its shareholders at the Annual General Meeting on 23 April 2008.
>
> As part of the ordinary increase of its share capital, UBS AG has issued 760,295,181 new shares with a par value of CHF0.10 each. The subscription price of the new shares was set at CHF 21.00. Subscription rights for 755,466,901 new shares were exercised, representing 99.4% of all new shares offered. 4,828,280 new shares, for which subscription rights were not validly exercised, will be sold by UBS Investment Bank in open market transactions on 13 June 2008..
>
> Trading in the new shares is expected to commence today on SWX Europe, the New York Stock Exchange and the Tokyo Stock Exchange. Payment and settlement of the new shares is expected to take place on 17 June 2008.
>
> *       *       *

Notice to U.S. Persons

The issuer has filed a registration statement (including a prospectus) with the Securities and Exchange Commission (the "SEC") for the offering to which this communication relates. Before you invest, you should read the prospectus in that registration statement and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering. You may get these documents for free by visiting EDGAR on the SEC Web site at www.sec.gov. Alternatively, the issuer, any underwriter or any dealer participating in the offering will arrange to send you the prospectus if you request it by calling UBS AG at +41-44-236-6770 or, if you are calling from the United States of America, by calling toll-free +1-866-541-9689.

**Defendants' False Statements During the Class Period**

94.     On May 4, 2004, UBS filed with the SEC its quarterly report for the first quarter of 2004 on Form 6-K. Defendants reported operating income for the three months ending March 31, 2004 of CHF 10.295 billion, net profit of CHF 2.423 billion and basic EPS of CHF 2.25.

95.     The report also included a letter to shareholders signed by Defendants Ospel and Wuffli in which they stated, in relevant part:

> With our best quarterly performance on record, the year has started extremely well. Net profit was CHF 2,423 million, double our result in first quarter 2003 (and up 82% before goodwill). Revenues rose 33%. Earnings per share increased 114% to CHF 2.25 while return on equity was at 29.2% -record quarterly levels for both.
>
> This outstanding performance is naturally a reflection of the excellent trading conditions in major financial markets and the positive effect of strong market valuations on invested assets. We also believe, however, that it shows the payoff from investing in our businesses somewhat countercyclically over the past few years - positioning ourselves for exactly these kinds of opportunities
>
> *                    *                    *
>
> ***Our wealth management and institutional asset management businesses profited as financial markets attracted more frequent investor activity. Strong market valuations also helped asset-***

*based fees. Our Wealth Management and Global Asset Management units reported their best results in three years, and the Wealth Management USA business reported its best operating performance since PaineWebber became part of UBS.*

\*       \*       \*

*Net new money flows are the best indicator of growth in our wealth and asset management businesses. This quarter saw clients add CHF 35 billion to their investments with UBS. Private investors added a record CHF 19 billion to our wealth management businesses worldwide, compared to CHF 11 billion a year earlier.*

\*       \*       \*

One of our major investments is in our brand, which this quarter was reflected in a new global advertising campaign, launched in February. Our advertising investment concentrates on key markets where we need to further build familiarity with our brand in order to achieve our growth targets - particularly the US. The campaign - themed "You and us" - shows how UBS delivers global financial resources through personal client relationships based on intimate understanding.

(Emphasis added.)

96.     The report also sets forth what the Company considers its "four main performance indicators": Return on Equity, Basic EPS, Cost to Income Ratio, and NNM. As the Report states, "[UBS has] four main performance indicators, which indicate how we focus on continually improving returns to our shareholders." With respect to NNM, the report states, in relevant part:

Our wealth management businesses had an excellent first quarter and continued to attract strong net new money inflows, spread across the globe. In first quarter 2004, inflows were at a record CHF 19.0 billion, up from CHF 11.1 billion in the same quarter a year ago. *The Wealth Management unit attracted a record CHF 16.2 billion inflow in first quarter 2004, compared to CHF 7.4 billion a year earlier.* The international clients business saw strong inflows into Asia, Eastern Europe and our domestic European wealth management business, which itself saw a record inflow of CHF 4.2 billion. *In the US, net new money was CHF 2.8 billion in first quarter 2004, down slightly from CHF 3.7 billion a year earlier.*

(Emphasis added.)

97.    Regarding the Wealth Management segment, Defendants stated, "In first quarter 2004, Wealth Management recorded its best quarterly result in three years. Pre-tax profit was CHF 868 million, up 23% from fourth quarter 2003."

98.    Defendants also stated, in relevant part:

> The Swiss Clients business also showed a record intake of CHF 1.1 billion, reflecting successful client acquisition activity. *In first quarter, the net new money intake from existing clients was particularly high.* Our extremely strong performance reflects continuous investment in our domestic European business as well as other growth areas, among them the Asia Pacific region, giving us significantly enhanced capacity. A clear example of that is our client advisor workforce, which has expanded by 19% over the last two years. The stronger market environment, as well as certain seasonal effects, also had a positive influence.
>
> *        *        *
>
> In first quarter 2004, Wealth Management's pre-tax profit was CHF 868 million, up CHF 163 million, or 23%, from fourth quarter 2003. This was the best result in three years and reflected higher operating income, which rose on gains in asset-based and transaction fees. In contrast, operating expenses increased only slightly, allowing almost the entire rise in operating income to be captured in the bottom line.
>
> *        *        *
>
> We started the year with very strong results. The helpful market environment was reflected in very high client activity levels, a rising asset base, and exceptionally strong inflows of net new money. The countercyclical investments we have made in our franchise and staff over the last two years have started to pay off, giving us the opportunity to grow in markets where new wealth is being created. We are in a prime position to further grow our asset base and continue to improve profitability although we are obviously dependent on overall market developments that have an impact on client activity levels, our asset base and therefore, profitability.

(Emphasis added.)

99.    On August 10, 2004, UBS filed with the SEC its quarterly report for the second quarter of 2004 on Form 6-K. Defendants reported operating income for the three

months ending June 30, 2004 of CHF 9.484 billion, net profit of CHF 1.974 billion and basic earnings per share of CHF 1.85.

100.   In the letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

> It was our second-best quarterly performance since 2000, 19% down from the record first quarter. Our wealth management business performed particularly well with profit 34% up year-on-year as clients' invested assets rose to CHF 750 billion, the highest level for three years.

101.   With regard to the NNM performance indicator, Defendants stated, "Net new money inflows in our wealth management businesses remain very strong, although they were down from the exceptional levels of first quarter 2004. Inflows in second quarter 2004 totaled CHF 10.4 billion, down from CHF 19.0 billion in the previous quarter."

102.   In the section of the report devoted to the Wealth Management segment, Defendants boasted, "Wealth Management's pre-tax profit was CHF 881 million in second quarter 2004, 1 % above the very strong first quarter 2004 figure, and the best quarterly result since first quarter 2001. Net new money, at CHF 8.2 billion, benefited from continued strong inflows into our European and Asian wealth management businesses. Business Banking Switzerland's pre-tax profit, at CHF 508 million, remained strong, declining only CHF 2 million from first quarter 2004. "

103.   Defendants stated, in relevant part:

> Net new money in second quarter 2004 was CHF 8.2 billion, down from the record inflow of CHF 16.2 billion in first quarter-when the market environment encouraged a burst of investment activity. The International Clients business reported CHF 7.1 billion in net new money, with positive inflow of CHF 2.7 billion into our domestic European business and a continued strong performance in Asia. ***Net new money in our Swiss Clients business was CHF 1.1 billion, unchanged from the first quarter's record level, reflecting a further quarter of successful client acquisition.***

\*     \*     \*

Our European wealth management business continued to report very strong net new money results. The inflow this quarter totaled CHF 2.7 billion, with the UK and Germany again recording particularly good performances. In first half 2004, net new money totaled CHF 6.9 billion, corresponding to an annualized growth rate of 30% of the underlying asset base at the end of 2003.

\*     \*     \*

Delivering the firm to ultra high net worth individuals

The super-rich really are different. They invest on an institutional scale. Their enterprises deal with investment banks. And their numbers are growing faster than the rest of the high net worth sector. According to the *Capgemini Merrill Lynch World Wealth Report,* there are now about 70,000 individuals globally with more than USD 30 million in financial assets each.

With a focus on this market, our Wealth Management business launched an ultra high net worth client (UHNWI) initiative in late 2002. The principal aim was to build a unit dedicated to serving ultra-wealthy clients located in Europe, Asia Pacific, Latin America and other regions. The US market is the subject of a separate initiative....

Both moves start from the insight that the needs of ultra high net worth clients differ not only in scale but also qualitatively from those of other wealthy individuals. We discern three "clusters" within this segment, comprising families who behave like institutions and seek family office investment management services; entrepreneurs whose wealth is locked up in their owner-managed enterprises; and independently wealthy individuals.

The UHNWI business is organized to meet specific requirements in each of these clusters. It comprises its own unit serving family offices, a corporate advisory group specializing in corporate finance solutions for clients with family-owned businesses, and even in-house art banking and vineyard-broking expertise.

In addition, the initiative seeks to "deliver the entire firm"-meaning the resources of all the firm's Business Groups. Some clients, for example, mandate assets to the Global Asset Management business. Others have turned to the Investment Bank for help with corporate financing issues.

(Emphasis added.)

104.    On September 30, 2004, UBS filed its 2004 Midyear Report with the SEC on Form 6-K. In the report, Defendants stated, "UBS reported in first half 2004 a net profit of CHF 4,397 million, compared to a net profit of CHF 2,746 million in first half 2003."

105.    Defendants stated, "Net new money in the wealth management units remained strong, with inflows of CHF 29.4 billion in first half 2004, up by CHF 7.9 billion from the same period a year ago. The Wealth Management unit attracted CHF 24.4 billion in first half 2004, compared to CHF 13.9 billion in first half 2003. The international clients business saw strong inflows, particularly in Asia and in our domestic European wealth management business, which itself saw a record inflow of CHF 6.9 billion."

106.    Defendants stated the following regarding the Wealth Management unit, in relevant part,

> The first half 2004 net new money inflow of CHF 24.4 billion was CHF 10.5 billion higher than the first half 2003 figure of CHF 13.9 billion. The International Clients business reported CHF 22.2 billion in net new money, with positive inflows into the European wealth management business and a continued strong performance in Asia. Net new money in our Swiss Clients business was CHF 2.2 billion, reflecting successful client acquisition.
>
> *        *        *
>
> In first half 2004, Wealth Management's pre-tax profit was CHF 1,749 million, up CHF 559 million from first half 2003 reflecting higher operating income which rose on gains in asset based and transaction fees, combined with slightly lower operating expenses, driven by a drop in non-personnel related expenses.

107.    On November 3, 2004, UBS filed with the SEC its quarterly report for the third quarter of 2004 on Form 6-K. Defendants reported operating income for the three months ending September 30, 2004 of CHF 8.456 billion, net profit of CHF 1.671 billion and basic earnings per share of CHF 1.60.

108.    In the letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

> This quarter's results showcase the strength of our asset gathering businesses. At a time when securities markets are offering less attractive trading returns, the fact that UB S has not only the world's leading wealth management operation, but also one of the fastest growing, is crucial to our ability to deliver top-class returns to you, our shareholders.
>
>     \*      \*      \*
>
> ***In third quarter, net new money for the firm as a whole was CHF 20.5 billion. Wealthy individual clients worldwide contributed CHF 16.7 billion; during the first nine months of this year, our wealth management businesses have gathered a total of CHF 46.1 billion in new assets, at an annualized growth rate of 5%.*** This leading rank in wealth management is a privileged strategic position to occupy, and we remain convinced that all our global areas of focus-including the investment banking, securities and asset management businesses - will deliver above average growth opportunities for UBS.
>
>     \*      \*      \*
>
> Our efforts to grow organically are also delivering tangible results. Since its launch in 2001, our European wealth management business has seen inflows coming in at an average annual rate of 40%. Revenues hit a record level as client investments rose to CHF 69 billion in third quarter.
>
>     \*      \*      \*
>
> Outlook- In the first nine months of 2004, market conditions for our trading-related businesses have swung considerably - from an exceptionally favorable first quarter to the rather tough environment in third quarter. Across these varied conditions, our diversified business mix has paid off, helping us to capture the revenue opportunities when equity and fixed income markets were buoyant, with our wealth and asset management businesses giving us a counterbalance when trading conditions started to normalize.
>
> While global economic fundamentals look rather positive, market participants are currently unsure about how long the current growth will last. This prevailing uncertainty continues to weigh on financial markets. In the short term, this may continue to dampen levels of investor activity - an important driver for many of our businesses. That said, it looks as though we will be able to look back on 2004 as one of UBS's best years, and our focused strategy and success in

attracting new clients give us a great deal of confidence for 2005 and beyond.

\*       \*       \*

***Our wealth management businesses had another excellent quarter, attracting strong net new money of CHF 16.7 billion for the quarter, bringing total inflows in the first nine months of this year to CHF 46.1 billion.*** The Wealth Management unit posted its second best net new money result ever, attracting CHF 11.4 billion in third quarter 2004 compared to net new money of CHF 8.2 billion in the previous quarter. ***Healthy inflows were recorded from clients in Asia and the Americas and into our domestic European wealth management business, which saw net new money of CHF 3.2 billion***.

(Emphasis added.)

109.    Defendants highlighted the Wealth Management unit in the Company's third quarter results, stating, "Our result in third quarter 2004 clearly reflects the strength of our wealth and asset management businesses, both of which reported very solid results."

110.    Notably, Defendants began reporting "operational risks" alongside market risks and credit risk in their quarterly reports, stating, "Our operational risk framework, into which we are investing considerable management time and effort, aims to contain the levels of risk, and ensure we have sufficient information to make informed decisions about additional or adjusted controls." Defendants also stated, "[a]ll provisions for operational risk established at UBS are based on management's best estimates and follow this practice. When any potential operational risk is able to be quantified more accurately, the corresponding provision is revised up or down."

111.    Regarding the Wealth Management segment, Defendants stated, "[i]n third quarter 2004, Wealth Management's pre-tax profit was CHF 855 million, down 3% from second quarter 2004. Net new money, at CHF 11.4 billion in third quarter 2004, was at its second-highest level ever, with continued strong inflows into our European wealth management business and from Asian clients. Business Banking Switzerland's pre-tax

profit was CHF 517 million in third quarter 2004, up by CHF 9 million from the previous quarter." Defendants stated, in relevant part:

> ***Net new money in third quarter 2004 was CHF 11.4 billion, up from CHF 8.2 billion in the previous quarter. It was the second highest quarterly inflow ever recorded, reflecting very strong performances in our Asian and Americas businesses - with our European wealth management business also contributing another CHF 3.2 billion in net new money.*** Combined with the record inflow in first quarter 2004, and a strong performance in second quarter, clients have invested CHF 35.8 billion of net new money for the first nine months of this year, corresponding to an annualized growth rate of 7% of the invested asset base at the end of 2003.
>
> *       *       *
>
> Our European wealth management business continued to report very strong inflows of net new money. The inflow this quarter totaled CHF 3.2 billion, with particularly good performances in the UK and Germany. In the first nine months of 2004, net new money inflows have totaled CHF 10.1 billion, corresponding to an annualized growth rate of 29% of year-end 2003 assets.
>
> *       *       *
>
> In third quarter 2004, Wealth Management's pre-tax profit was CHF 855 million, down CHF 26 million or 3% from second quarter 2004. Operating income was slightly lower, as higher asset-based fees and interest income were more than offset by declining transaction income as a result of lower client activity levels, reflecting a usual summer slowdown. Operating expenses rose slightly because of the continued implementation of our expansion plans.
>
> (Emphasis added.)

112.   On February 8, 2005, UBS filed with the SEC its quarterly report for the fourth quarter of 2004 on Form 6-K. Defendant Wuffli signed the report. In the report, Defendants announced operating income for the three months ending December 31, 2004 of CHF 9.167 billion, net profit of CHF 2.021 billion and basic earnings per share of CHF1.97.

113.    In the letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

We are pleased to be able to report that 2004 has been a record year for UBS. Our net profit for the year stood at CHF 8,089 million, with CHF 45 million coming from our industrial holdings. Our financial businesses contributed the remaining CHF 8,044 million, up 29% from a year earlier despite the falling US dollar. Our clients entrusted us with a total of CHF 88.9 billion in net new money this year, bringing total invested assets to CHF 2.3 trillion. In turn this drove our asset-based revenues 19% higher. This, combined with higher income from our investment banking business and private client transactions, pushed fee and commission income up to 52% of revenues.

*        *        *

When we look at fourth quarter, net profit stood at CHF 2,021 million, with CHF 1,993 million coming from our financial businesses (up 10% from the same quarter a year earlier). This strong result, a record for a fourth quarter, was driven by an excellent performance in the securities businesses and the continued strength of all our wealth and asset management businesses.

*        *        *

*Net new money inflows in fourth quarter totaled CHF 16.4 billion. Our wealth management businesses worldwide contributed CHF 13.3 billion, with strong inflows from Asian, US and onshore European clients.*

*        *        *

Outlook -- A record result is always challenging to beat As every year, our investment banking and securities business will have to contend with the somewhat unpredictable rise and fall of the world's financial markets. But 2004 showed that our wealth and asset management businesses can provide both growth momentum and earnings quality, even if trading conditions fluctuate. We will continue re-investing in our growth businesses and expect 2005 to be the next exciting step on a journey we believe will be very rewarding for our long-term investors.

*        *        *

Our wealth management businesses continue to show strong inflows of net new money. In fourth quarter 2004, they totaled CHF 13.3 billion against CHF 16.7 billion in third quarter 2004.

The wealth management units attracted CHF 6.5 billion in fourth quarter 2004, compared to CHF 11.4 billion a quarter earlier. Our European wealth management business, seeing another quarter of strong inflows, recorded its second-best performance ever. Flows from Asian clients were also extremely strong. ***In our Wealth Management USA business, net new money was CHF 6.8 billion in fourth quarter 2004, up from CHF 5.3 billion in third quarter 2004. It was the best quarterly inflow in 2004, reflecting improving investor sentiment following the US presidential election, and the positive impact of new hires in our advisor force.***

For full-year 2004, net new money inflows into our wealth management businesses totaled CHF 59.4 billion, up 17% from CHF 50.8 billion in 2003, corresponding to an annual growth rate of 4.4% of the asset base at the end of 2003.

(Emphasis added.)

114.    Defendants made the same statements regarding "operational risks" as they did in the third quarter 2004 report.

115.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

In fourth quarter 2004, Wealth Management's pre-tax profit was CHF 831 million, a 3% decline from third quarter 2004. Net new money, at CHF 6.5 billion, benefited from continued strong inflows from European and Asian clients. Business Banking Switzerland's pre-tax profit was CHF 510 million in fourth quarter, down 1% from third quarter 2004.

\*       \*       \*

Net new money in fourth quarter 2004 was CHF 6.5 billion, down from CHF 11.4 billion in third quarter. It was a record fourth quarter, but some-what below our average run rate as the Swiss Clients Area saw seasonal withdrawals. The International Clients Area, posting another strong result, recorded CHF 7.2 billion in net new money, with performance driven by the second highest inflow ever into our domestic European business and a further strong inflow from Asian clients. The Swiss Clients Area showed a small outflow of CHF 0.7 billion, down from the inflow of CHF 0.4 billion in third quarter 2004.

In full-year 2004, net new money inflows totaled CHF 42.3 billion, up 42% from CHF 29.7 billion in 2003, representing an annual growth rate of 6% of the underlying invested asset base at end-

2003. This excellent performance saw gains in all geographical areas, especially from Asian clients, and a particularly strong CHF 13.7 billion inflow into our European wealth management business.

116.     On March 16, 2005, UBS filed with the SEC  its annual report for 2004 on Form 20-F, which includes the Company's annual financial report that was also filed with the SEC separately on Form 6-K on April 8, 2005. The annual report stated, "Our Form 20-F filing is structured as a "wrap-around" document. Most sections of the filing are satisfied by referring to parts of the Handbook 2004/2005 or to parts of this Financial Report 2004. However, there is a small amount of additional information in Form 20-F which is not presented elsewhere, and is particularly targeted at readers in the US. You are encouraged to refer to this additional disclosure."

117.         Defendant Wuffli signed the report. He also signed SOX certifications in connection with this report.

118.     For the 12 months ending December 31, 2004, the Company reported operating income of CHF 37.402 billion, net profit of CHF 8.089 billion and basic earnings per share of CHF 7.68.

119.     In the report, Defendants stated, in relevant part:

> Our wealth management businesses continued to show strong inflows of net new money. For full-year 2004, net new money inflows into our wealth management businesses totaled CHF 59.4 billion, up 17% from CHF 50.8 billion in 2003, corresponding to an annual growth rate of 4.4% of the asset base at the end of 2003. Wealth Management attracted CHF 42.3 billion in 2004, compared to CHF 29.7 billion in 2003.
>
> *        *        *
>
> In our Wealth Management USA business, net new money was CHF 17.1 billion, down from CHF 21.1 billion a year earlier, reflecting a slow asset-gathering performance at the beginning of the year as well as the US dollar's weakening against the Swiss franc.
>
> *        *        *
>
> Our 2004 result was the best ever. The first quarter saw an all-time performance record and the year ended with our best-ever fourth

quarter. Net profit in 2004 was CHF 8,044 million, up by 29% from CHF 6,239 million in 2003. Before goodwill and excluding the sale of our Correspondent Services Corporation (CSC) clearing subsidiary, completed in second quarter 2003, net profit rose by 24%. The increase was driven by higher revenues in all categories, clearly outpacing cost growth. Our asset-based revenues showed particular strength, reflecting improved market valuations as well as strong inflows of net new money into our wealth and asset management businesses. Overall, we attracted CHF 88.9 billion in net new money in 2004, up 29% from CHF 69.1 billion in 2003.

120.    Regarding the Wealth Management unit, Defendants stated, in relevant part:

In 2004, Wealth Management's pre-tax profit was CHF 3,435 million, a 32% increase from 2003. Strong inflows from most markets resulted in net new money rising to CHF 42.3 billion from CHF 29.7 billion a year earlier.

*      *      *

In 2004, net new money inflows totaled CHF 42.3 billion, up 42% from CHF 29.7 billion in 2003, representing an annual growth rate of 6% of the underlying invested asset base at end-2003. This excellent performance was driven by gains in all geographical areas, especially from Asian clients, and a particularly strong CHF 13.7 billion inflow into our European wealth management business.

*      *      *

Our European wealth management business continued to make significant progress. With a particularly good performance in the UK and Germany, the inflow of net new money in 2004 was CHF 13.7 billion, up 27% from the previous year's intake of CHF 10.8 billion. The result reflects an annual net new money in-flow rate of 30% of the underlying asset base at year-end 2003.

*      *      *

In 2004, income from our European wealth management business was CHF 437 million, up 64% from a year earlier, reflecting our growing asset and client base.

121.    In the Handbook incorporated in the Annual Report, Defendants reported the Company's approach to risk management, in relevant part:

Because taking risk is an integral part of our business, our overriding goal is to achieve an appropriate balance between risk and return, limiting the scope for adverse variations in our earnings from exposure to major individual "stress" events.

Credit and market risks have long been regarded as the primary risks of any banking business. In future, operational risk - the consequential risk of being in business - will play an equally important role. Our operational risk framework, into which we are investing considerable management time and effort, aims to contain the levels of these risks and ensure we have sufficient information to make informed decisions about adding or adjusting controls.

122.   Regarding the Wealth Management unit, Defendants stated, in relevant part:

Business strategies

In the wealth management business, our services are targeted at high net worth and affluent clients around the world, whether investing internationally or in their home country. Many of our potential clients have become increasingly sophisticated in their financial needs - giving us an opportunity to provide them with premium wealth and asset management services, which have more attractive margins than standardized services in retail or consumer finance. Individualized service and a wide range of choices are central to our client offering, with our in-house range of products enhanced by a quality-screened selection of third-party products.

123.   Defendants further stated, in relevant part:

Our client advisors combine strong personal relationships with the resources that are available from across UBS, helping them provide a full range of wealth management services -from asset management to estate planning and from corporate finance advice to art banking. Our open product platform gives clients access to a wide array of prescreened, top-quality products from third-party providers that complement UBS's own lines.

Organizational structure

We are organized into the two business areas of:

Wealth Management – Swiss Clients, covering clients domiciled in Switzerland, and organized into eight geographic regions.

Wealth Management – International Clients, serving clients domiciled outside Switzerland. This area is organized into the seven regions of: Italy; Western Europe; Benelux (Belgium, Netherlands, Luxembourg), Germany and Central Europe; UK, North and Eastern Europe; Eastern Mediterranean, Middle East and Africa; Asia Pacific; and Americas International.

\*       \*       \*

A clearly structured advisory process helps client advisors add value at each step and provides our clients with a consistent and comprehensive experience. The consistent delivery of a truly consultative advisory experience combined with a complete product positioning framework is essential to putting our value proposition into action. Our approach can be broken down into four clear, mutually enhancing steps. In the first, our advisors take the time to understand what it is their clients want and need, and look at all the different factors that might affect their goals and willingness to take risk. As a second step, the advisor formulates investment proposals crafted for that client's specific requirements by selecting from the best products and services available. In the third step, the advisor agrees with the client which of the solutions should be implemented. The fourth step rounds out the whole experience with comprehensive monitoring and reporting of investment performance to the client by the advisor, as well as regular communication between the two in which goals and strategies are constantly evaluated, and adjusted as required. Our extensive training programs ensure that client advisors become fully versed in all aspects of this structured, four-step advisory experience. In a recent survey, almost 90% of our wealth management clients in Switzerland said their main banking relationship with UBS had lasted for more than 10 years.

124.   Regarding Risk Management, Defendants stated, in relevant part:

Good risk management and control lie at the heart of any business, particularly a financial services firm - they are integral parts of providing consistent, high-quality returns to shareholders. If we fail to adequately manage and control our risks we may suffer financial losses. Potentially more important is the resultant damage to our reputation, which could undermine our share price by reducing our client base, and impairing our ability to retain talented employees. Ultimately, regulators might be forced to impose constraints upon our business.

We recognize that taking risk is core to our financial business and that operational risks are an inevitable consequence of being in business. Our aim is to achieve an appropriate balance between risk and return. ***Thus, in our day-to-day business and in the strategic management of our balance sheet and capital, we seek to limit the scope for adverse variations in our earnings and control exposure to "stress events."***

We base our approach to risk management and control on five principles.

Business management is accountable for all the risks assumed throughout the firm and is responsible for the continuous and active management of all risk exposures to ensure that risk and return are balanced. This responsibility applies not only to the traditional banking risks of credit and market risk but also to the many and varied operational risks that potentially arise from inadequate or failed internal processes, people or systems or from external causes, which may be deliberate, accidental or natural.

An independent control process is implemented when required by the nature of the risks, in particular to balance short-term profit incentives and the long-term interests of UBS. The control functions are responsible for providing an objective check on risk-taking activities.

***Comprehensive, transparent and objective risk disclosure to our senior management, the Board of Directors, shareholders, regulators, rating agencies and other stakeholders is the cornerstone of the risk control process.***

We protect our earnings by controlling risk at the level of individual exposures, at a portfolio level and in aggregate, across all risk types and businesses, relative to our risk capacity-the level of risk we are capable of absorbing, based on our earnings power.

***We protect our reputation by managing and controlling the risks incurred in the course of our business, and for this reason we avoid concentrations of exposure and limit potential stress losses, not only from credit, market and liquidity risks but also from operational risks. We avoid extreme positions in transactions that are sensitive for tax, legal, regulatory or accounting reasons, and adopt a cautious approach to any risks that cannot be sensibly evaluated or priced.*** We strive to achieve the highest standards in protecting the confidentiality and integrity of our client information, and in the ethical approach we apply in all our business dealings..

All employees, but in particular those involved in risk decisions, must make UBS's reputation an overriding concern. Responsibility for our reputation cannot be delegated or syndicated.

Key responsibilities

Excellence in risk management is fundamentally based upon a management team that makes risk identification and control critical components of its processes and plans. Responsibility therefore flows from the top.

The *Board of Directors* is responsible for the firm's fundamental approach to risk, for approving our risk principles and for determining our risk capacity.

The *Chairman's Office* oversees the risk profile of the firm on behalf of the Board of Directors and has ultimate authority for credit, market and other risk related matters.

The *Group Executive Board (GEB)* is responsible for implementing the risk principles, including approval of core risk policies, for appointing Business Group management that demonstrates both business and control competence, and for managing the risk profile of UBS as a whole.

The *Group ChiefRisk Officer (CRO)* has overall responsibility for the development and implementation of the Group's risk control principles, frameworks, limits and processes across market, credit and operational risk. Effective 1 March 2005, a new GEB position was established for the Group Chief Risk Officer.

The *Group Chief Financial Officer (CFO)* is responsible for transparency in the financial performance of UBS and its Business Groups, including high-quality and timely reporting.

The *Group Chief Credit* Officer *(CCO) and Group General Counsel,* in their areas of responsibility, develop the risk control principles, formulate risk policies, and determine methodologies for measuring and assessing risks.

The *Group Treasurer* is responsible for management of UBS's financial resources and financial structure and for governance of treasury processes and transactions, including funding and liquidity risks.

The *Group Controller* is responsible for the production, analysis and delivery of accurate and objective financial and regulatory accounts and reports, for establishing accounting policies, and for global control and co-ordination of tax issues.

Within the Business Groups, the control functions are empowered to enforce the risk principles and are responsible for the implementation of independent control processes.

*       *       *

Operational risk can arise in a number of ways:

*Transaction processing risk* arises from errors, failures or shortcomings at any point in the transaction process, from deal execution and capture to final settlement.

*Compliance risk* is the risk of financial loss due to regulatory fines or penalties, restriction or suspension of business, or mandatory corrective action.  Such risks may be incurred by not adhering to applicable laws, rules, regulations, accounting standards, local or international best practice, or our own internal standards.

*Legal* risk is the risk of financial loss resulting from the non-enforceability of our actual or anticipated rights arising under law, a contract or other arrangement.

*Liability risk* is the risk that we, or someone acting on our behalf, fail to fulfill the obligations, responsibilities or duties imposed by law or assumed under a contract and that claims are therefore made against us.

*Security risk* is the risk of loss of confidentiality, integrity or availability of our information or other assets.

*Tax risk* is the risk of additional tax arising from technically incorrect positions taken on tax matters, or failure to comply with tax withholding or reporting requirements on behalf of clients or employees; and the risk of claims by clients or counterparties as a result of our involvement in tax sensitive products or transactions.

Failure to identify, manage or control any of these risks, including business risks, may result not only in financial loss but also in loss of reputation, and repeated or widespread failure compounds the impact. Reputation risk is not directly quantifiable and cannot be managed and controlled independently of other risks.

(Emphasis added.)

125.   Regarding the NYSE listing rules and other compliance regulations, Defendants stated, in relevant part:

UBS aims to comply with all relevant standards on corporate governance. As a foreign company, listed on the New York Stock Exchange (NYSE), we are only required to comply with the rules relating to audit committees and annual certifications. UBS, however, has voluntarily adopted the overwhelming majority of the NYSE rules for US companies.

\*       \*       \*

Corporate Governance Guidelines, Code of Business Conduct and Ethics, and Whistleblowing Protection

The Board of Directors has adopted corporate governance guidelines, which are published on the UBS website at www.ubs.com/corporate-governance.

The Board of Directors has also adopted a Code of Business Conduct and Ethics with an Addendum for principal executive, financial and accounting officers or controllers, as required by the Sarbanes-Oxley Act. The code is available on the UBS website at www.ubs.com/corporate-governance.

The Audit Committee of the Board has established rules for the handling of complaints related to accounting and auditing matters in addition to the internal policies on Whistleblowing Protection for Employees and on Compliance with Attorney Standards of Professional Conduct. The Audit Committee Procedures are available on the UBS website (www.ubs.com/corporate-governance).

126.    Regarding Corporate Responsibility, Defendants made the following statements, in relevant part:

Corporate Responsibility

UBS makes responsible behavior an important part of its culture, identity and business practice. As a leading global financial services firm, we want to provide our clients with value-added products and services, promote a corporate culture that adheres to the highest ethical standards, and generate superior but sustainable returns for our shareholders. We are committed to being an equal opportunity employer, protecting the environment, adhering to high social standards, and contributing to the communities which we are a part of. For us, behaving responsibly sometimes means moving beyond solely profit-oriented considerations and legal requirements when doing business.

*       *       *

In 2001, we created a Corporate Responsibility Committee. It discusses and judges how to meet the evolving expectations of our stakeholders related to our corporate conduct. If it comes to the conclusion that there is gap between what stakeholders expect and what we practice - and that this gap represents either a risk or an opportunity to the firm - the committee suggests appropriate measures to management, which is then responsible for implementing solutions.

The committee is chaired by Marcel Ospel, Chairman of UBS, and includes one other member of the Board of Directors and seven senior UBS executives representing our businesses, as well as a number of corporate functions, including legal, communication and risk management.

127.    The statements in UBS's quarterly and annual reports for fiscal 2004 set forth above were false and misleading because:

(a)    Defendants intentionally failed to disclose that the operating income, net profit, EPS and other performance indicators reported by Defendants were materially improved as a direct result of revenues derived from monies funneled to UBS as part of the Company's fraudulent tax evasion scheme about which Defendants knew and encouraged;

(b)    Defendants intentionally failed to disclose that a materially significant contribution to the Company's NNM performance indicator each quarter and annually was derived from Defendants' tax evasion scheme; and

(c)    Defendants knew their fraudulent tax evasion scheme violated a number of rules and regulations in the U.S. and abroad and rendered their quarterly and annual reports false and misleading.

128.    On May 4, 2005, UBS filed with the SEC its quarterly report for the first quarter of 2005 on Form 6-K. Defendant Wuffli signed the report. Defendants reported operating income for the three months ending March 31, 2005 of CHF 10.104 billion, net profit of CHF 2.625 billion and basic earnings per share of CHF 2.60.

129.    In a letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

> Revenues held up extremely well - even if our securities trading performance did not match the peak level achieved in buoyant markets a year ago. In another clear illustration of the diversity of our income stream, the strength of recurring revenues in our wealth and asset management businesses compensated for the slowdown in trading returns. This recurring revenue growth was in large part driven by our invested asset base, which grew to CHF 2.4 trillion this quarter, as clients once again trusted us with significant new assets. Net fee and commission income was almost at its all-time high, making up more than 50% of our overall operating income, and including the highest investment fund fees we have ever reported. Our total inflow of net new money was CHF 32.3 billion this quarter, with wealthy individual clients contributing CHF 21.2 billion. Our European wealth management business alone had an

intake of CHF 5.6 billion. Although this is a business we started building just four years ago, it already has a proven track record of attracting clients and growing revenue. Interest income from lending to private clients also rose, driven mainly by lending to wealthy US clients and higher mortgage volumes in Switzerland.

*      *      *

Technological sophistication, combined with ever-increasing scale and complexity, increases our exposure to operational risk. Regulators have also become ever less tolerant of mistakes. Unfortunately, operational hazards are implicit in our business. That's why we are investing significantly in the processes for identifying, managing and controlling our exposure to potential operational risks. Effective operational risk management ensures that we can focus on what we are supposed to do-creating value for our shareholders and our clients, while minimizing the time, energy and attention paid to preventable "fire fighting" exercises.

***We cannot sacrifice the way we manage risks for the sake of growth.*** With our latest leadership appointments, we have enhanced the roles of the key individuals responsible for building the firm's risk control success over the last few years. On 1 March, Walter Stuerzinger, our Chief Risk Officer since 2001, joined UBS's Group Executive Board, assuming firm-wide responsibility for market, operational and credit risk control.

(Emphasis added.)

130.    Regarding the NNM performance indicator, Defendants stated, in relevant part:

***Net new money in our wealth management businesses continues to be strong around the world. In first quarter 2005, we attracted CHF 21.2 billion, compared to CHF 13.3 billion in the previous quarter.*** Our Wealth Management unit recorded inflows of CHF 15.4 billion this quarter, up from CHF 6.5 billion in fourth quarter 2004 -its second best result ever, driven by high inflows into our domestic European business and further strong contributions from Asian clients. ***In our Wealth Management USA business, net new money remained strong at CHF 5.8 billion in first quarter 2005, compared to CHF 6.8 billion in fourth quarter 2004.***

(Emphasis added.)

131.    Defendants made the same representations regarding operational risks as they did in the third quarter 2004  report.

132.    In the section of the report devoted to the Wealth Management segment, Defendants stated, in relevant part:

> Net new money in first quarter 2005 was CHF 15.4 billion, up from CHF 6.5 billion in fourth quarter 2004. This intake was the second-best ever, behind first quarter 2004. The International Clients area recorded CHF 14.5 billion in net new money, driven by the record inflow into our domestic European business and further strong contributions from Asian clients. The Swiss Clients area showed an inflow of CHF 0.9 billion, a clear improvement from the outflow of CHF 0.7 billion in fourth quarter 2004, which was influenced by seasonal withdrawals.
>
> *       *       *
>
> European wealth management
>
> The first quarter 2005 net new money inflow of CHF 5.6 billion was our highest ever. This intake was CHF 2.0 billion above the inflow in fourth quarter 2004, reflecting strong performances in all our five target countries, with the strongest contributions coming from the UK and Germany, where we have the largest operations. The inflow reflects an annual net new money growth rate of 27% of the underlying asset base at year-end 2004.
>
> The level of invested assets reached a record CHF 90 billion on 31 March 2005, up from CHF 82 billion on 31 December 2004. The gain was a result of the significant net new money inflows, positive market performance and the appreciation of the US dollar against the Swiss franc.
>
> Results
>
> In first quarter 2005, Wealth Management's pre-tax profit, at CHF 915 million, was up 12% from CHF 818 million in fourth quarter 2004, at the highest level ever recorded. The result was helped by the fact that we ceased to amortize goodwill from first quarter 2005. Excluding goodwill, the increase was 10%. The strength mainly reflects increased asset-based fees from the record asset base as well as higher client activity levels.

133.    On June 30, 2005, Defendants announced they had merged the US, Swiss and International Wealth Management units into one. The release stated, in relevant part:

> UBS today announces the integration of its two wealth management units. UBS's US, Swiss and international wealth management businesses, as well as its Swiss corporate and retail

banking unit will be brought together in one Business Group titled Global Wealth Management & Business Banking under Chairman and CEO Marcel Rohner.

While the relationships between advisors and their clients will not be in any way altered, UBS expects to benefit from economies of scale in bringing together functions supporting the advisors. The move will accelerate UBS's progress towards a consistent wealth management offering across the globe, and will make it even easier to fulfil clients' individual needs with sophisticated products and services from across UBS.

Raoul Weil, head of UBS's wealth management business serving international clients, will join UBS's Group Executive Board from 1 July 2005.

134.   On August 10, 2005, UBS filed with the SEC its quarterly report for the second quarter of 2005 on Form 6-K. Defendant Wuffli signed the report. Defendants reported operating income for the three months ending June 30, 2005 of CHF 9.381 billion, net profit of CHF 2.147 billion and basic earnings per share of CHF 2.10.

135.   In a letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

Income in our financial businesses held up extremely well – Practically all major asset-based fee categories were up-in particular investment fund and portfolio management fees as markets rose and new client money flowed into UBS. Invested asset levels rose to CHF 2.6 trillion because of increasing market valuations and strong inflows of net new money of CHF 30 billion in second quarter. Net new money in our wealth management businesses was at a near record of CHF 19.2 billion, with particularly strong contributions into our domestic European business and from Asian clients.

*       *       *

The beginning of July marked a strategic milestone for our firm. We announced the integration of our wealth management franchise around the world by bringing our US, Swiss and international units along with our Swiss corporate and retail banking unit into one Business Group titled Global Wealth Management & Business Banking, headed by Marcel Rohner. Raoul Weil, head of our wealth management business serving international clients, joined UBS's Group Executive Board. Mark Sutton, previously Chairman and CEO of the Wealth Management USA business, has been

appointed to the new position of Chairman and CEO, Americas, responsible for accelerating the development of UBS's client base and integrating the work of UBS's businesses in the region. While the relationships between advisors and their clients will not in any way be altered by the integration, we expect to benefit from economies of scale in bringing together functions supporting our advisors. The move will accelerate our progress towards a consistent wealth management offering across the globe, and will make it even easier to fulfill clients' individual needs with sophisticated products and services from across UBS. With this integration, our highly successful municipal finance unit, previously located within the Wealth Management USA business, is being transferred to the Investment Bank's fixed income area.

136.    With regard to the NNM performance indicator, Defendants stated:

Net new money in our wealth management businesses continued to be strong. In second quarter 2005, we attracted CHF 19.2 billion, compared to CHF 21.2 billion in the previous quarter. Our Wealth Management unit reported inflows of CHF 18.4 billion this quarter, up from CHF 15.4 billion in first quarter 2005 - its best result ever, driven by record inflows into our domestic European business and further strong contributions from Asian clients. In our Wealth Management USA business, net new money was CHF 0.8 billion, down from a strong CHF 5.8 billion in first quarter, with the decline partially related to outflows attributable to April tax payments.

137.    Defendants made the same representations regarding "operational risks" as they did in the third quarter 2004 report.

138.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

In second quarter 2005, Wealth Management's pre-tax profit was CHF 963 million, a quarterly record and another increase from first quarter 2005. Net new money, at CHF 18.4 billion, was at its highest level ever, benefiting from continued strong inflows from European and Asian clients. Business Banking Switzerland's pre-tax profit rose to CHF 564 million - the second best result ever.

Net new money in second quarter 2005 was a record CHF 18.4 billion, up from CHF 15.4 billion in first quarter 2005. The international clients area recorded CHF 17.0 billion in net new money, driven by a record inflow into our domestic European

business and further strong contributions from Asian clients. The Swiss clients area showed an inflow of CHF 1.4 billion, a clear improvement from CHF 0.9 billion in first quarter 2005.

139.    On September 29, 2005, UBS filed its Midyear Report for 2005 with the SEC on Form 6-K. Defendant Wuffli signed the report. Defendants reported operating income for the six months ending June 30, 2005 of CHF 19.485 billion, net profit of CHF 4.772 billion and basic earnings per share of CHF 4.70.

140.    Regarding the NNM performance indicator, Defendants stated, in relevant part:

> Net new money in our wealth management businesses continued to be strong. In first half 2005, we attracted CHF 40.4 billion, compared to CHF 29.4 billion in the same period a year earlier. Our Wealth Management unit reported inflows of CHF 33.8 billion in first half, up from CHF 24.4 billion a year earlier - its best result ever, driven by record inflows into our domestic European business and further strong contributions from Asian clients. ***In our Wealth Management USA business, net new money was CHF 6.6 billion, up from CHF 5.0 billion a year earlier.***

> (Emphasis added.)

141.    Defendants made the same representations regarding operational risks as they did in the third quarter 2004 report.

142.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

> Net new money in first half 2005 was a record CHF 33.8 billion, up 39% from CHF 24.4 billion a year earlier. The international clients area recorded CHF 31.5 billion in net new money, driven by a record inflow into our domestic European business and further strong contributions from Asian clients. The Swiss clients area showed an inflow of CHF 2.3 billion, against CHF 2.2 billion a year earlier.

143.    On November 2, 2005, UBS filed with the SEC its quarterly report for the third quarter of 2005 on Form 6-K. Defendant Wuffli signed the report. Defendants

reported operating income for the three months ending September 30, 2005 of CHF 10.711 billion, net profit of CHF 2.770 billion and basic earnings per share of CHF 2.75.

144.    In a  letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

> Our wealth and asset management businesses benefited from record inflows of net new money and rising market valuations, helping them generate strong asset-based fees. The success of our lending activities in the wealth management businesses also continued to provide us with an important stream of recurring revenues.
>
> *       *       *
>
> Performance against our other targets remains strong. Inflows of net new money into our wealth management businesses in third quarter, at CHF 31.1 billion, were unusually high. US domestic clients contributed CHF 9.9 billion. Other international clients, notably in Asia and in our five key European markets, invested CHF 19.3 billion. In the Swiss market, we saw the third consecutive quarter of positive net new money with an inflow of CHF 1.9 billion. Including the record inflows of CHF 19.9 billion into our asset management business, net new money for the whole of UBS this quarter was an exceptionally strong CHF 51.2 billion.
>
> *       *       *
>
> ***Our key strategic initiatives are making good progress. After a smooth transfer, our US-based wealth management business is now operating alongside our international and Swiss business as part of one global wealth management franchise.***
>
> (Emphasis added.)

145.    Regarding Net New Money, Defendants stated, in relevant part:

> Net new money inflows in our wealth management businesses in third quarter were at a record CHF 31.1 billion, up from CHF 20.2 billion in second quarter, reflecting strong performances in all regions. The international business (excluding the domestic business in the US) recorded inflows of CHF 19.3 billion, driven by further growth in Asia and our five key European markets. The Swiss business, seeing its third consecutive quarter of positive net new money results, recorded an inflow of CHF 1.9 billion. ***US clients contributed CHF 9.9 billion in net new money, an***

> *extremely strong rebound from CHF 1.8 billion in second quarter.*

(Emphasis added.)

146.    Defendants made the same representations regarding operational risks as they did in the third quarter 2004 report.

147.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

> In third quarter 2005, net new money inflows into the wealth management units reached an all-time quarterly high of CHF 31.1 billion, with strong performances seen in all regions. Pre-tax profit for our international and Swiss wealth management businesses rose 21% from second quarter 2005 to a record CHF 1,166 million. In the USA, litigation provisions negatively impacted performance, resulting in a pre-tax loss of CHF 5 million, compared to a pre-tax profit of CHF 94 million in second quarter. Business Banking Switzerland's pre-tax profit was CHF 553 million, down marginally from second quarter.
>
> *            *            *
>
> Net new money was at an unusually high level of CHF 21.2 billion in third quarter 2005, up from CHF 18.4 billion in second quarter - and the highest quarterly level ever reported. In particular, it reflected further growth in our Asian business and the five key European markets. The international business recorded CHF 19.3 billion in net new money, while the Swiss business, with an inflow of CHF 1.9 billion, recorded its third consecutive positive quarter. Combined with the inflows in first and second quarter, clients have now invested CHF 55.0 billion in net new money with us over the first nine months of this year. This corresponds to an annualized growth rate of 9% of the invested asset base at the end of 2004, and already exceeds all full-year inflows ever seen.

148.    On February 15, 2006, UBS filed with the SEC its quarterly report for the fourth quarter of 2005 on Form 6-K. Defendant Wuffli signed the report. Defendants reported operating income for the three months ending December 31, 2005 of CHF 10.593 billion, net profit of CHF 6.487 billion and basic earnings per share of CHF 6.56.

149.    In a letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

> Our wealth and asset management businesses, in particular, had excellent years. The inflow of net new money (excluding Private Banks & GAM) was CHF 148 billion in 2005, up 80% from the strong result of CHF 82.2 billion achieved a year earlier. This, along with rising markets, drove invested assets up 25% on the year and, in turn, strengthened our asset-based fees.

150.    Regarding Net New Money, Defendants stated, in relevant part:

> Our wealth management businesses continue to gather assets rapidly in all regions. In fourth quarter 2005, net new money totaled CHF 19.7 billion. This followed a record inflow of CHF 31.1 billion in third quarter. The international business (meaning all businesses except the domestic businesses in the US and Switzerland) recorded inflows of CHF 13.4 billion, driven by further growth in our five key European markets and Asia. The Swiss business recorded an outflow of CHF 0.2 billion. ***Our US business contributed CHF 6.5 billion in net new money, CHF 3.4 billion below third quarter levels.*** For the whole of 2005, net new money inflows into our wealth management businesses totaled CHF 95.1 billion, up 57% from CHF 60.4 billion in 2004, corresponding to an annual growth rate of 6.9% of the asset base at the end of 2004.

> (Emphasis added.)

151.    Defendants made the same representations regarding operational risks as they did in the third quarter 2004 report.

152.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

> Pre-tax profit for our international and Swiss wealth management businesses was CHF 1,117 million in fourth quarter 2005, down 4% from the record result achieved in third quarter 2005. In the US, pretax profit rose to CHF 83 million from a pre-tax loss of CHF 5 million in third quarter. Business Banking Switzerland's pre-tax profit was CHF 541 million, down slightly from third quarter.

*       *       *

50

Net new money in fourth quarter 2005 was CHF 13.2 billion, down from the record level of CHF 21.2 billion achieved in third quarter. Although lower, it was still a record result for a fourth quarter and more than double the inflow in the same period a year earlier. The international business reported CHF 13.4 billion in net new money, down from CHF 19.3 billion in third quarter, with further inflows seen from both European and Asian clients. The Swiss business had a small outflow of CHF 0.2 billion compared to an inflow of CHF 1.9 billion in third quarter 2005.

For full-year 2005, net new money inflows stood at an all-time record of CHF 68.2 billion, compared with CHF 42.3 billion in 2004, or 9% of the underlying invested asset base at year-end 2004. This outstanding result reflected gains in all geographical areas, but especially from Asian clients, and a particularly strong CHF 21.8 billion inflow into our European wealth management business.

153.    On March 21, 2006, UBS filed with the SEC its annual report for 2005 on Form 20-F. Defendant Wuffli signed the report. He also signed SOX certifications connected with the report.

154.    For the twelve months ending December 31, 2005, Defendants reported operating income of CHF 39.896 billion, net profit of CHF 14.029 billion, and basic earnings per share of 13.93.

155.    Regarding Net New Money, Defendants stated, in relevant part:

Our wealth management businesses continue to gather assets rapidly in all regions. In 2005, net new money totaled CHF 95.1 billion, up 57% from CHF 60.4 billion in 2004, corresponding to an annual growth rate of 6.9% of the asset base at the end of 2004. Wealth Management International & Switzerland recorded inflows of CHF 68.2 billion, driven by further growth in our five key European markets and Asia. *Our US business contributed CHF 26.9 billion in net new money, CHF 8.8 billion above 2004 levels.*

Starting in 2006, we will be reporting net new money for all financial businesses. For the whole of 2005, net new money was CHF 148.0 billion, an all-time high, and up 80% from CHF 82.2 billion a year earlier. This amounts to an annual growth rate of 7% of the asset base at the end of 2004. All the figures above exclude Private Banks & GAM.

*        *        *

Our 2005 result was the best ever, with all our financial businesses reporting a stronger performance than a year earlier.

*       *       *

***Asset-based revenues showed particular strength, reflecting rising market levels as well as strong inflows into our wealth and asset management businesses.***

(Emphasis added.)

156.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

Pre-tax profit for our international and Swiss wealth management businesses was CHF 4,161 million, up 23% from the result achieved in 2004. In the US, pre-tax profit rose to CHF 312 million from CHF 29 million a year earlier. Business Banking Switzerland's pre-tax profit was CHF 2,189 million, up 9% from 2004.

*       *       *

In 2005, net new money inflows totaled CHF 68.2 billion, up 61% from CHF 42.3 billion in 2004, representing an annual growth rate of 8.8% of the underlying invested asset base at end-2004. This excellent performance was driven by gains in all geographical areas, especially from Asian clients, and a particularly strong CHF 21.8 billion inflow into our European wealth management business.

157.    In the Handbook incorporated in the Annual Report, Defendants discussed the strategy of the Wealth Management unit, stating, in relevant part:

In the wealth management business, our services are designed for high net worth and affluent individuals around the world, whether investing internationally or in their home country. Many of our potential clients have become increasingly sophisticated in their financial needs - which we meet by providing them with premium wealth and asset management services, as they have more attractive margins than standardized services in retail or consumer finance. Individualized service and a wide range of choices are central to our client offering, with our in-house range of products enhanced by a quality-screened selection of third-party products.

158.    Defendants made the following statements regarding risk management, in relevant part:

Because taking risk is an integral part of our business, our overriding goal is to achieve an appropriate balance between risk and return, limiting the scope for adverse variations in our earnings from exposure to major individual "stress" events.

Credit and market risks have long been regarded as the primary risks of any banking business. Now, however, operational risk – the consequential risk of being in business plays an equally important role. ***Our operational risk framework, into which we are investing considerable management time and effort, aims to contain the levels of these risks and ensure we have sufficient information to make informed decisions about adding or adjusting controls.***

(Emphasis added.)

159.    Regarding the Wealth Management unit. Defendants stated, in relevant part:

Wealth Management International & Switzerland

With more than 140 years of experience, an extensive global network, and CHF 982 billion in invested assets on 31 December 2005, our 4,154 client advisors consistently deliver high-quality, individually tailored solutions to our clients worldwide.

Business

The Wealth Management International & Switzerland unit provides a comprehensive range of products and services individually tailored for wealthy clients around the world via its global branch network and through financial intermediaries.

Our client advisors combine strong personal relationships with the resources that are available from across UBS, helping them to provide a full range of wealth management services - from asset management to estate planning and from corporate finance advice to art banking. Our open product platform gives clients access to a wide array of pre-screened, top-quality products from third-party providers that complement UBS's own lines.

Organizational structure

We are organized into the two business areas of:

-Wealth Management - Swiss Clients, covering clients domiciled in Switzerland, and organized into eight geographic regions.

-Wealth Management - International Clients, serving clients domiciled outside Switzerland. This area is organized into the seven regions of: Italy; Western Europe; Benelux (Belgium,

Netherlands, and Luxembourg), Germany, and Central Europe; UK, North, and Eastern Europe; Eastern Mediterranean, Middle East, and Africa; Asia Pacific; and Americas International.

We also provide financial intermediaries, both inside and outside Switzerland, with our solutions, products and services, helping them to add substantial value to their client relationships.

160.    Regarding risk management, Defendants stated, in relevant part:

Good risk management and control lie at the heart of any business, particularly a financial services firm - they are integral parts of providing consistent, high-quality returns to shareholders. If we fail to adequately manage and control our risks we may suffer significant financial losses. Potentially more important is the resultant damage to our reputation, which could undermine our share price by reducing our client base and impairing our ability to retain talented employees. Ultimately, regulators might be forced to impose constraints upon our business.

We recognize that taking risk is core to our financial business and that operational risks are an inevitable consequence of being in business. Our aim is not, therefore, to eliminate all risks but to achieve an appropriate balance between risk and return. Thus, in our day-to-day business and in the strategic management of our balance sheet and capital, we seek to limit the scope for adverse variations in our earnings and exposure to "stress events" for all the material risks we face.

We base our approach to risk management and control on five principles.

Business management is accountable for all the risks assumed throughout the firm and is responsible for the continuous and active management of risk exposures to ensure that risk and return are balanced. This responsibility applies not only to the traditional banking risks of credit and market risk but also to the many and varied operational risks that potentially arise from inadequate or failed internal processes, people or systems or from external causes, which may be deliberate, accidental or natural.

An independent control process is implemented when required by the nature of the risks, in particular to balance short-term profit incentives and the long-term interests of UB S. The control functions are responsible for providing an objective check on risk-taking activities.

Comprehensive, transparent and objective *risk disclosure* to our senior management, the Board of Directors, shareholders, regulators,

rating agencies and other stakeholders is the cornerstone of the risk control process.

We protect our earnings by controlling risk at the level of individual exposures, at a portfolio level and in aggregate, across all risk types and businesses, relative to our risk capacity-the level of risk we are capable of absorbing, based on our earnings power.

We protect our reputation by managing and controlling the risks incurred in the course of our business, and for this reason we avoid concentrations of exposure and limit potential stress losses, not only from credit, market and liquidity risks but also from operational risks. We avoid extreme positions in transactions that are sensitive for tax, legal, regulatory or accounting reasons, and adopt a cautious approach to any risks that cannot be sensibly evaluated or priced. We adopt the highest standards in protecting the confidentiality and integrity of our client information, and aim to maintain the highest ethical standards in all our business dealings. All employees, but in particular those involved in risk decisions, must make UBS's reputation an overriding concern. Responsibility for our reputation cannot be delegated or syndicated.

*     *     *

Operational risk framework

Every function, whether a front-end business or a control or logistics unit, must manage the operational risks that arise from its own activities. Because operational risk is all pervasive, with a failure in one area potentially impacting many others, our framework is based on mutual oversight across all functions. Each Business Group has therefore established cross-functional bodies as an integral part of its governance structure, to actively manage operational risk.

To ensure the integrity of risk management decisions, each Business Group also has an Operational Risk Control unit, the head of which reports functionally to the Group Head of Operational Risk. The primary remit of these units is to confirm the effective implementation of the operational risk frame work in the Business Group and to ensure transparent assessment and reporting of operational risks to senior management.

The totality of this information is reviewed by functional managers to assess their operational risk exposure and the actions needed to address specific issues. Regular reports are made both within the Business Groups and to the Group CRO to allow senior management to assess the overall operational risk profile.

\*       \*       \*

Regulatory compliance is a prerequisite for effective operational risk management and control and comes primarily in the form of Basel 11, Sarbanes-Oxley Section 404 (SOX 404) and other related requirements (e.g. the Federal Deposit Insurance Corporation Improvement Act in the US). The Operational Risk Framework serves broadly as the backbone of the Bank's approach to internal control requirements, and thus forms a key component of the SOX 404 compliance requirement that will come into effect at the end of 2006. Because this evaluation is a specialized form of risk assessment, a specific SOX Office has been created under the Group CFO. This office liaises closely with the Group and Business Group Operational Risk Controllers to ensure an efficient flow of information.

The operational risk framework provides information that can be used in specialized risk evaluations. The operational risk assessments by the Business Groups can, for example, provide valuable information in support of legal and compliance risk assessments. This concept will be developed further for use in other specialist areas such as human resources and tax to ensure that the operational risk framework continues to help us achieve excellence in operational risk management and control.

161.    Regarding regulatory affairs at UBS, Defendants stated, in relevant part:

We aim to comply with all applicable provisions and to work closely and maintain good relations with regulators in all jurisdictions where we conduct business.

\*       \*       \*

Regulation and supervision in the US

Banking regulation

UBS's operations in the United States are subject to a variety of regulatory regimes. It maintains branches in California, Connecticut, Illinois, New York and Florida. UBS's branches located in California, New York and Florida are federally licensed by the Office of the Comptroller of the Currency. US branches located in Connecticut and Illinois are licensed by the state banking authority of the state in which the branch is located. Each US branch is subject to regulation and examination by its licensing authority. In addition, the Board of Governors of the Federal Reserve System exercises examination and regulatory authority over our state-licensed US branches. We also maintain state and federally chartered trust companies and other limited purpose

banks, which are regulated by state regulators or the Office of the Comptroller of the Currency. Only the deposits of

UBS's subsidiary bank located in the state of Utah are insured by the Federal Deposit Insurance Corporation. The regulation of our US branches and subsidiaries imposes restrictions on the activities of those branches and subsidiaries, as well as prudential restrictions, such as limits on extensions of credit to a single borrower, including UBS subsidiaries and affiliates.

The licensing authority of each US branch has the authority to take possession of the business and property of UBS located in the state of the office it licenses in certain circumstances. Such circumstances generally include violations of law, unsafe business practices and insolvency. As long as UBS maintains one or more federal branches, the Office of the Comptroller of the Currency also has the authority to take possession of the US operations of UBS AG under similar circumstances, and this federal power may preempt the state insolvency regimes that would otherwise be applicable to our state-licensed branches. As a result, if the Office of the Comptroller of the Currency exercised its authority over the US branches of UBS AG pursuant to federal law in the event of a UBS insolvency, all of UBS's US assets would most likely be applied first to satisfy creditors of our US branches as a group, and then made available for application pursuant to any Swiss insolvency proceeding.

In addition to the direct regulation of our US banking offices, operating US branches subjects UBS to regulation by the Board of Governors of the Federal Reserve System under various laws, including the International Banking Act of 1978 and the Bank Holding Company Act of 1956. On 10 April 2000, UBS AG was designated a "financial holding company" under the Bank Holding Company Act of 1956. Financial holding companies may engage in a broader spectrum of activities, including underwriting and dealing in securities. To maintain its financial holding company status, UBS, its US subsidiary federally chartered trust company, and its US subsidiary bank located in Utah are required to meet or exceed certain capital ratios and UBS's US branches, its US subsidiary federally chartered trust company, and its US subsidiary bank located in Utah are required to meet or exceed certain examination ratings.

A major focus of US governmental policy relating to financial institutions in recent years has been aimed at combating money laundering and terrorist financing. Regulations applicable to UBS and its subsidiaries impose obligations to maintain appropriate policies, procedures and controls to detect, prevent and report

money laundering and terrorist financing and to verify the identity of their customers. Failure of a financial institution to maintain and implement adequate programs to combat money laundering and terrorist financing could have serious legal and reputational consequences for the institution.

* * *

UBS aims to comply with all relevant standards on corporate governance. As a foreign company, listed on the New York Stock Exchange (NYSE), we are only required to comply with the rules relating to audit committees and annual certifications. UBS, however, has voluntarily adopted the overwhelming majority of the NYSE rules for US companies.

162.   Regarding corporate responsibility, Defendants stated, in relevant part:

Corporate Responsibility

Responsible behavior is an important part of our culture, identity and business practice.

We make responsible behavior an important part of our culture, identity and business practice. As a leading global financial services firm, we want to provide our clients with value-added products and services, promote a corporate culture that adheres to the highest ethical standards, and generate superior but sustainable returns for our shareholders. We are committed to being an equal opportunity employer, protecting the environment, adhering to high social standards, and contributing to the communities that we are a part of.

Behaving responsibly can sometimes mean moving beyond solely profit-oriented considerations and legal requirements when doing business.

163.   The statements in UBS's quarterly and annual reports for fiscal 2005 set forth above were false and misleading because:

(a)   Defendants intentionally failed to disclose that the operating income, net profit, EPS and other performance indicators reported by Defendants were materially improved as a direct result of revenues derived from monies funneled to UBS as part of the Company's fraudulent tax evasion scheme about which Defendants knew and encouraged;

(b)      Defendants intentionally failed to disclose that a materially significant contribution to the Company's NNM performance indicator each quarter and annually was derived from Defendants' tax evasion scheme; and

(c)      Defendants knew their fraudulent tax evasion scheme violated a number of rules and regulations in the U.S. and abroad and rendered their quarterly and annual reports false and misleading.

164.   On May 4, 2006, UBS filed with the SEC its quarterly report for the first quarter of 2006 on Form 6-K. Defendant Wuffli signed the report. Defendants reported operating income for the three months ending March 31, 2006 of CHF 12.380 billion, net profit of CHF 3.504 billion and basic earnings per share of CHF 3.55.

165.   In a letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

> Summary of first quarter results.
>
> Overall, our performance was driven by a strong increase in revenues, with the growing asset base in our wealth and asset management businesses driving recurring income higher. Net new money inflows were very strong, reaching CHF 48 billion in first quarter 2006, compared with CHF 34.9 billion in the same period a year earlier and CHF 31.2 billion in fourth quarter 2005. Inflows from the wealth management units were at an unprecedented high of CHF 33.6 billion, with strong results in our domestic European business and sustained high contributions from Asian clients. Inflows of net new money in the asset management business, at CHF 12.6 billion, were also very strong and reflected the quality of our diversified investment management platform.
>
> *       *       *
>
> Our growth strategy has proven to be successful, increasing our confidence in our ambition to be the best global financial services provider. That is why we have renewed our vision of UBS and the values we share internally. Now, our colleagues around the world share our firmly held belief in performance, entrepreneurial spirit and high ethical standards, and can concentrate on what is the purpose of all our businesses: uncompromised client focus. In the eyes of individuals, corporations or financial institutions searching

for advice on financial matters, this will continue to distinguish us
from our competitors.

166.     Regarding Net New Money, Defendants stated, in relevant part:

Net new money of CHF 48.0 billion, up from CHF 35.2 billion a
year earlier. Inflows continued to be very strong worldwide. The
Wealth Management units recorded inflows of CHF 33.6 billion
this quarter, up from CHF 24.1 billion a year earlier, reflecting
high inflows into our domestic European business and further
strong contributions from Asian clients. The Swiss retail business
recorded a net new money inflow of CHF 1.8 billion. Global Asset
Management experienced a high inflow of CHF 12.6 billion.
Institutional clients, mainly in Europe and the Americas, drove
performance, as did inflows into the wholesale intermediary
business worldwide.

167.     Defendants made substantially the same statements regarding "operational

risks" as they did in the third quarter 2004 report.

168.     Regarding the Wealth Management segment, Defendants stated, in relevant

part:

Global Wealth Management & Business Banking's pre-tax profit
was CHF 2,021 million in first quarter 2006. Pre-tax profit for the
international and Swiss wealth management businesses was a
record CHF 1,276 million in first quarter 2006, up 14% from fourth
quarter 2005. In the US, pre-tax profit rose to CHF 186 million
from CHF 83 million in fourth quarter. Net new money from all
wealth management businesses totaled CHF 33.6 billion in first
quarter, a new record. Business Banking Switzerland's pre-tax
profit was CHF 559 million, up 3% from fourth quarter.

*        *        *

Net new money in first quarter 2006 was a record CHF 24.7
billion, nearly double the CHF 13.2 billion achieved in fourth
quarter 2005. The International Clients area reported CHF 21.8
billion in net new money, driven by high inflows into our domestic
European business and another quarter of strong contributions from
Asian clients. The Swiss Clients area showed a record inflow of
CHF 2.9 billion, compared with an outflow of CHF 0.2 billion in
fourth quarter 2005, which was influenced by seasonal
withdrawals.

169.    On August 15, 2006, UBS filed with the SEC its quarterly report for the second quarter of 2006 on Form 6-K. Defendant Wuffli signed the report. Defendants reported operating income for the three months ending June 30, 2006 of CHF 12.057 billion, net profit of CHF 3.147 billion and basic earnings per share of CHF 1.58.

170.    In a  letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

> *Fee income comprised more than half of overall income in second quarter. Asset-based revenues, such as fees from investment funds or portfolio management, continued to benefit from the high levels of invested assets.*
>
> *        *        *
>
> *Net new money remained healthy*. In second quarter, net inflows totaled CHF 36.3 billion, up from CHF 31.0 billion a year earlier. The wealth management units recorded inflows of CHF 31.2 billion, driven by all-time high inflows from Asian and European clients. In the US, inflows of net new money declined, reflecting the usual weakening in second quarter when annual income tax payments are due. Net new money in the asset management business also slowed, with inflows into asset allocation funds and alternative investments partly offset by outflows in some institutional mandates and in our business with financial intermediaries. Invested assets totaled CHF 2,657 billion at the end of June, down 4% from 31 March 2006, with the US dollar's decline against the Swiss franc and market movements outweighing strong net new money.
>
> (Emphasis added.)

171.    Regarding NNM, Defendants stated, in relevant part:

> Net new money of CHF 36.3 billion, up from CHF 31.0 billion a year earlier. Inflows remained strong. The wealth management units recorded inflows of CHF 31.2 billion this quarter, up from CHF 20.2 billion in second quarter 2005. Inflows in the international and Swiss wealth management business rose to a record CHF 30.5 billion, driven by all-time high inflows from Asian and European clients. Annual client tax payments and the negative market environment, however, depressed inflows into our wealth management business in the US. Global Asset Management inflows fell to CHF 3.6 billion, down from CHF 8.9 billion a year

earlier. Inflows from institutional clients in Europe, the Middle East and Africa and alternative and quantitative products were partly offset by equities outflows in the US. The wholesale intermediary business recorded equities and fixed income out-flows, due to market volatility, which were partly offset by inflows into asset allocation funds. The Swiss retail banking business recorded net new money inflows of CHF 1.5 billion.

172.    Defendants made substantially the same statements regarding operational risks as they did in the third quarter 2004 report.

173.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

> Global Wealth Management & Business Banking achieved pre-tax profits of CHF 2,094 million in second quarter 2006. Pre-tax profit for the international and Swiss wealth management businesses rose to another quarterly record of CHF 1,283 million, up 1% from first quarter 2006. Wealth Management US's pre-tax profit was CHF 179 million this quarter, down 4% from first quarter 2006. Net new money inflows from the wealth management businesses were a strong CHF 31.2 billion in second quarter. Business Banking Switzerland's pre-tax profit was a record CHF 632 million, up 13% from first quarter 2006.
>
> *        *        *
>
> Net new money in second quarter 2006 was a record CHF 30.5 billion, up 23% from CHF 24.7 billion in first quarter 2006. The international clients area reported inflows of CHF28.8 billion, driven by record inflows into our domestic European business and another quarter of strong contributions from Asian clients. The Swiss clients area showed an inflow of CHF 1.7 billion, down from a very high CHF 2.9 billion in first quarter 2006.

174.    On September 29, 2006, UBS filed with the SEC its Midyear Report for 2006 on Form 6-K. Defendant Wuffli signed the report. Defendants reported operating income for the six months ending June 30, 2006 of CHF 24.437 billion, net profit of CHF 6.651 billion and basic earnings per share of CHF 3.36.

175.    Regarding NNM, Defendants stated, in relevant part:

> Net new money of CHF 84.3 billion in first half 2006, up from CHF 66.2 billion a year earlier. Inflows remained strong. The wealth management units recorded inflows of CHF 64.8 billion in

first half 2006, up from CHF 44.3 billion a year earlier. Inflows into the Swiss and international wealth management businesses were CHF 55.2 billion in first half 2006, up from CHF 33.8 billion a year earlier, driven by very strong inflows into our domestic European business and in Asia. Inflows into the US-based wealth management business were CHF 9.6 billion in first half 2006, down slightly from CHF 10.5 billion a year earlier, reflecting the decline in equity markets that started in the middle of May. Inflows into the asset management business, were CHF 16.2 billion in first half, down from CHF 18.7 billion a year earlier. The Swiss retail business saw inflows of CHF 3.3 billion, up from CHF 3.0 billion a year earlier.

176.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

> ***Net new money in first half 2006 was a record CHF 55.2 billion, up from CHF 33.8 billion in the same period a year earlier.*** The international clients area reported inflows of CHF 50.6 billion, driven by record inflows into the domestic European business and strong contributions from Asian clients. The Swiss clients area showed an inflow of CHF 4.6 billion, up from CHF 2.3 billion a year earlier.

> (Emphasis added.)

177.    On October 31, 2006, UBS filed with the SEC its quarterly report for the third quarter of 2006 on Form 6-K. Defendant Wuffli signed the report. Defendants reported operating income for the three months ending September 30, 2006 of CHF 10.462 billion, net profit of CHF 2.199 billion and basic earnings per share of CHF 1.11.

178.    In a letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

> Net income from interest margin products rose on higher margin lending volumes in the wealth management businesses and the continued growth of our Swiss mortgage business, as well as wider spreads on client deposits.

> Net fee and commission income rose in third quarter from a year earlier to reach 58% of overall operating income. The Investment Bank generated strong revenues in the advisory and debt underwriting businesses. Debt capital markets recovered

significantly from a year earlier. The mergers and acquisitions environment was vigorous.

179.    Regarding Net New Money, Defendants stated, in relevant part:

[N]et new money of CHF 41.9 billion, down from a record high of CHF 51.2 billion a year earlier. Inflows remained strong worldwide. The wealth management units recorded inflows of CHF 26.8 billion this quarter, down from CHF 31.1 billion in third quarter 2005. Inflows in the international and Swiss wealth management business rose to CHF 23.4 billion, driven by inflows from Asia and the Americas. Within this, net new money in European Wealth Management was CHF 2.7 billion in third quarter 2006, down from CHF 5.6 billion in third quarter 2005, as asset gathering slowed in July and August. Strong inflows in Italy and the UK were partly offset by small outflows in other European markets. Inflows into our domestic wealth management business in the US were CHF 3.4 billion in third quarter, down sharply from the record of CHF 9.9 billion a year earlier, but up from CHF 0.7 billion in second quarter. Global Asset Management inflows fell to CHF 15.5 billion, down from the strong CHF 19.9 billion result a year earlier. Of the total, CHF 8.8 billion was into money market funds, which tend to experience larger quarterly swings than other asset classes. The Swiss retail banking business recorded net new money outflows of CHF 0.4 billion. Overall, UBS net new money in the first nine months of 2006 was at a record CHF 126.2 billion.

180.    Defendants made substantially the same statements regarding operational risks as they did in the third quarter 2004 report.

181.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

Global Wealth Management & Business Banking pre-tax profit fell 12% to CHF 1,837 million in third quarter 2006 from CHF 2,094 million in second quarter 2006. Pre-tax profit for the international and Swiss wealth management businesses was CHF 1,226 million, down 4% from the record CHF 1,283 million in second quarter 2006. Due to the provision on a long-term lease on a New Jersey office building, Wealth Management US's pre-tax profit was CHF 43 million this quarter, down from CHF 179 million in second quarter. Net new money inflows from the wealth management businesses were a strong CHF 26.8 billion in third quarter. Business Banking Switzerland's pre-tax profit was CHF 568 million, down 10% from the record level set in second quarter.

\*      \*      \*

Net new money in third quarter 2006 was a strong CHF 23.4 billion, down from the record CHF 30.5 billion in second quarter 2006. The international clients area reported inflows of CHF 21.3 billion, led by strong contributions from Asian clients. The Swiss clients area showed an inflow of CHF 2.1 billion, up from CHF 1.7 billion in second quarter 2006.

182.   On February 13, 2007, UBS filed with the SEC its quarterly report for the fourth quarter of 2006 on Form 6-K. Defendant Wuffli signed the report. Defendants reported operating income for the three months ending December 31, 2006 of CHF 12.272 billion, net profit of CHF 3.407 billion and basic earnings per share of CHF 1.73.

183.   In a letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

In fourth quarter, we ended the year on a strong note. As in the first two quarters of 2006, profits from continuing operations in our financial businesses exceeded CHF 3 billion. We are especially proud since this followed the relatively challenging conditions experienced in the summer. In the quarter, income again expanded on the continued strong levels of asset-based revenues in our wealth and asset management businesses, reflecting sustained inflows of assets from clients and strengthening financial markets.

\*      \*      \*

The results of all our businesses improved notably in 2006 from a year earlier. Net new money from clients totaled CHF 151.7 billion, with CHF 113.3 billion contributed by the wealth management business, which experienced strong client flows all around the world, and particularly in Asia and Europe.

***As a result of strong inflows and rising markets, invested assets nearly reached the CHF 3 trillion mark. Recurring fees, including asset-based revenues and income from private client lending businesses, were up significantly compared with 2005***.

(Emphasis added.)

184.   Regarding Net New Money, Defendants stated, in relevant part:

[N]et new money of CHF 25.5 billion, down from a record fourth quarter of CHF 31.1 billion a year earlier. The wealth management units recorded inflows of CHF 21.7 billion this quarter, up from

CHF 19.7 billion in fourth quarter 2005. Inflows in the international and Swiss wealth management business rose by CHF 5.8 billion to CHF 19.0 billion, mainly driven by inflows from Asia and the Americas. Net new money in European wealth management was CHF 1.8 billion in fourth quarter 2006, down from CHF 3.7 billion in fourth quarter 2005, as higher asset gathering in Italy and France was more than offset by smaller inflows in other European countries. ***Inflows into our domestic wealth management business in the US were CHF 2.7 billion in fourth quarter, down from CHF 6.5 billion a year earlier and CHF 3.4 billion in third quarter. Although the result was lower, the inflow of net new money compared favorably with peers in terms of the growth rate relative to the asset base.*** The asset management business saw inflows fall to CHF 5.5 billion, down from CHF 10.9 billion a year earlier. Institutional clients reported CHF 5.2 billion in new inflows, mainly driven by contributions from alternative and quantitative and fixed income investments, partly offset by outflows in some equity capabilities. The wholesale intermediary business saw an inflow of CHF 0.3 billion, down from CHF 6.6 billion in the same quarter a year earlier, mainly due to outflows in equities and fixed income. Of the total, CHF 0.2 billion flowed out of money market funds, which tend to experience larger quarterly swings than other asset classes. The Swiss retail banking business recorded net new money outflows of CHF 1.7 billion in fourth quarter, primarily relating to transfers of client assets from discretionary to custody mandates. Overall, UBS's net new money in full-year 2006 was at a record CHF 151.7 billion, driven by higher inflows in the international wealth management business (up CHF 26.6 billion) and from institutional clients in the asset management business (up CHF 8.5 billion). This, however, was partially offset by lower inflows from wholesale intermediary clients (down CHF 20.8 billion) and the US wealth management business (down CHF 11.2 billion).

(Emphasis added.)

185.   Regarding operational risks, Defendants stated, in relevant part:

Operational losses can be caused by external factors, deliberate, accidental or natural, or failures of internal processes, people or systems. They can unfortunately never be entirely eliminated. Especially in today's environment of complex global processes, low regulatory tolerance for error, and growing propensity for litigation, operational risk runs alongside market and credit risk as one of UBS's principal risk classes.

Our operational risk framework, into which we have been investing considerable management time and effort, aims to contain the levels of risk, and to ensure that we have sufficient information to make informed decisions about additional or adjusted controls.

The program of work on Sarbanes-Oxley 404 is nearing completion. The internal control framework over financial disclosure has now been fully documented and to date we have no material weaknesses to report. Management's assessment and the auditor's report will be included in our annual financial report.

As far as the accounting for operational risks is concerned, many potential causes of loss are identified before the probability, timing, or amounts of future cost are known with certainty. IFRS (International Financial Reporting Standards) requires us to make a provision, based on the best estimate of a liability, when it is probable that a payment will be required, even if the amount to be paid has not yet been exactly determined. This requires the exercise of judgment. Once we are able to quantify any potential operational risk more accurately, the corresponding provision is revised up or down.

186.    Regarding the Wealth Management segment, Defendants stated, in relevant

part:

Global Wealth Management & Business Banking pre-tax profit increased 19% to CHF 2,189 million in fourth quarter 2006 from CHF 1,837 million in third quarter 2006. Pre-tax profit for the international and Swiss wealth management businesses was CHF 1,418 million, up 16% from CHF 1,226 million in third quarter 2006. Wealth Management US's pre-tax profit was CHF 174 million this quarter, up from CHF 43 million in third quarter. Business Banking Switzerland's pre-tax profit was CHF 597 million, up 5% from third quarter.

*        *        *

Net new money in fourth quarter 2006 was a strong CHF 19.0 billion, down from CHF 23.4 billion in third quarter 2006, but a record for a fourth quarter. The international clients area received inflows of CHF 18.9 billion, led by strong contributions from Asia and the Americas. The Swiss clients area inflow was CHF 0.1 billion, down from CHF 2.1 billion in third quarter 2006-with the decline reflecting normal end-of-year outflows in most parts of the country.

*        *        *

Results

Full-year 2006 pre-tax profit, at a record CHF 5,203 million, rose 25% compared with 2005. Total operating income was up 20% in 2006, reflecting a higher asset base and increased collateralized lending volumes as well as increased client activity. Operating expenses, up 15% in 2006 from 2005, also rose as our business expanded.

In fourth quarter 2006, pre-tax profit, at CHF 1,418 million, was up 16% from CHF 1,226 million in third quarter 2006.

187.     On March 21, 2007, UBS filed its annual report for 2006 with the SEC on Form 20-F. Defendant Wuffli signed the report. He also signed SOX certifications in connection with the report.

188.     For the twelve months ended December 31, 2006, Defendants reported operating income of CHF 47.171 billion, net profit of CHF 12.257 billion, and basic earnings per share of CHF 6.20.

189.     Regarding NNM, Defendants stated, in relevant part:

> **[N]et new money at a record CHF 151.7 billion, up from CHF 148.0 billion a year earlier (excluding Private Banks & GAM), corresponding to an annual growth rate of 5.7% of the asset base at the end of 2005.** Inflows remained strong worldwide. Wealth Management International & Switzerland recorded inflows of CHF 97.6 billion, driven by consistently high inflows during the year, particularly in Asia Pacific and Europe, both a result of our growth strategy. Our US business contributed CHF 15.7 billion in net new money, CHF 11.2 billion below 2005 levels. Global Asset Management inflows fell to CHF 37.2 billion, down from the strong CHF 49.5 billion result a year earlier. The Swiss retail business recorded net new money inflows of CHF 1.2 billion.
>
> *             *             *
>
> On a continuing basis, 2006 was another record year for UBS, with all businesses reporting a stronger performance in 2006 compared with a year earlier. Attributable net profit in 2006 was CHF 11,253 million. Discontinued operations contributed CHF 4 million, compared with CHF 4,075 million in 2005, when we sold Private Banks & GAM. Net profit from continuing operations was CHF 11,249 million, up 19% from CHF 9,442 million in 2005. It was at the highest level ever, fueled by a 19% increase in income, which rose to CHF 47,015 million. Asset-based revenues showed

particular strength, reflecting rising market levels as well as strong inflows into our wealth and asset management businesses. Brokerage fees were up, reflecting brisk client activity. Corporate finance and underwriting fees rose, not just because of buoyant capital market conditions, but also as a result of our efforts to grow our market share in key sectors, such as large cap deals, emerging markets, technology and as a partner of financial sponsors. Overall, net fee and commission income now contributes 55% to total operating income in 2006.

190.    Regarding Wealth Management International and Switzerland, Defendants stated, in relevant part:

In 2006, net new money was a record CHF 97.6 billion, compared with CHF 68.2 billion in 2005, representing an annual growth rate of 10% of the underlying invested asset base at end-2005. This outstanding result reflected increases.

191.    With regard to UBS's internal controls, Defendants stated, in relevant part:

The Board of Directors and management of UBS AG (UBS) are responsible for establishing and maintaining adequate internal control over financial reporting. UBS's internal control over financial reporting is designed to provide reasonable assurance regarding the preparation and fair presentation of published financial statements in accordance with International Financial Reporting Standards (IFRS) including a reconciliation of net profit and equity attributable to UBS shareholders to US Generally Accepted Accounting Principles (US GAAP).

UBS's internal control over financial reporting includes those policies and procedures that:

-    Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect transactions and dispositions of assets;

-    Provide reasonable assurance that transactions are recorded as necessary to permit preparation and fair presentation of financial statements, and that receipts and expenditures of the company are being made only in accordance with authorizations of UBS management; and

-    Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

69

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

UBS management assessed the effectiveness of UBS's internal control over financial reporting as of December 31, 2006 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. Based on this assessment, management believes that, as of December 31, 2006, UBS's internal control over financial reporting was effective.

The audited consolidated financial statements of UBS include the results of Banco UBS Pactual S.A. but management's assessment does not include an assessment of the internal control over financial reporting of this entity because it was acquired on December 1, 2006. This approach is consistent with published SEC guidance on the permissible scope of management's internal control report. The financial statements for this entity reflect total assets and operating income constituting less than 1 % of the related consolidated financial statement amounts as of and for the year ended December 31, 2006.

Management's assessment of the effectiveness of UBS's internal control over financial reporting as of December 31, 2006 has been audited by Ernst & Young Ltd, UBS's independent registered public accounting firm, as stated in their report appearing on page 78, which expressed unqualified opinions on management's assessment and on the effectiveness of UBS's internal control over financial reporting as of December 31, 2006.

192. The statements in UBS's quarterly and annual reports for fiscal 2006 set forth above were false and misleading because:

(a)     Defendants intentionally failed to disclose that the operating income, net profit, EPS and other performance indicators reported by Defendants were materially improved as a direct result of revenues derived from monies funneled to UBS as part of the Company's fraudulent tax evasion scheme about which Defendants knew and encouraged;

(b)     Defendants intentionally failed to disclose that a materially significant contribution to the Company's NNM performance indicator each quarter and annually was derived from Defendants' tax evasion scheme; and

(c)     Defendants knew their fraudulent tax evasion scheme violated a number of rules and regulations in the U.S. and abroad and rendered their quarterly and annual reports false and misleading.

193.   On May 3, 2007, UBS filed with the SEC its quarterly report for the first quarter of 2007 Form 6-K. Defendant Wuffli signed the report. Defendants reported operating income for the three months ending March 31, 2007 of CHF 13.347 billion, net profit of CHF 3.275 billion and diluted earnings per share of CHF 1.62.

194.   In a letter to shareholders, Defendants Ospel and Wuffli stated, in relevant part:

> Looking at first quarter results in more detail - our financial businesses, whose performance we focus on, reported another record result from continuing operations, with attributable profit of CHF 3,182 million, up 4% from first and fourth quarter 2006. This was driven by revenue growth in all our businesses and came despite negative trading revenues from the Investment Bank's proprietary capital managed by DRCM of approximately CHF 150 million in the context of difficult market conditions in US mortgage securities.
>
> Operating income rose, even though credit loss recoveries fell as expected and despite the absence of last year's gains from the sale of our stake in the New York Stock Exchange. Growth was driven by fee and commission income, which reached its highest level since 2001 and represents more than half of total income. ***Invested asset levels increased to CHF 3.1 trillion, as a result of strong net new money inflows as well as higher financial markets compared with first quarter a year earlier. This drove asset-based fees up in both our wealth and asset management businesses.***
>
> *     *     *
>
> Our record first quarter 2007 performance highlights the strength of our wealth management business. Its power remains unmatched across the industry. ***Wealthy clients around the globe entrusted us with a total CHF 44.8 billion in net new money in first quarter,***

***85% of our total net new money inflow.*** Asian markets continue to be a major contributor to this success, as well as the domestic European business. ***This quarter, we were pleased to see strong inflows of CHF 10.9 billion from our domestic US business, as a result of our success in attracting new customers and increasing the levels of funds invested by existing ones.*** We continued to hire advisors in our international and Swiss business, and were pleased to retain a majority of advisors from our recent acquisition of McDonald Investments in the US. In addition, our US-based wealth management business has started to expand its products and sales support capabilities in order to take full advantage of our integrated global wealth management platform.

(Emphasis added.)

195.   Regarding NNM, Defendants stated, in relevant part:

[N]et new money of CHF 52.8 billion, at its highest level ever, was up from CHF 48.0 billion a year earlier. The wealth management units recorded inflows of CHF 44.8 billion this quarter, up from CHF 33.6 billion in first quarter 2006. Inflows in the international and Swiss wealth management business rose by CHF 9.2 billion to CHF 33.9 billion, mainly driven by higher inflows from Asia and the Americas. Net new money in European wealth management was CHF 5.4 billion in first quarter 2007, down from CHF 6.5 billion in first quarter 2006, as higher inflows in Germany and Italy were more than offset by lower inflows in other European countries. Inflows into our domestic wealth management business in the US were CHF 10.9 billion in first quarter, up from CHF 8.9 billion a year earlier. This increase was driven by higher inflows from both existing and new clients. The asset management business saw inflows fall to CHF 5.3 billion, down from CHF 12.6 billion a year earlier. Institutional clients reported CHF 2.7 billion in new inflows, mainly driven by contributions from fixed income, multi-asset and alternative investments, partly offset by outflows in equity capabilities. The wholesale intermediary business saw an inflow of CHF 2.6 billion, down from CHF 5.5 billion in the same quarter a year earlier, mainly due to lower inflows in multi-asset and outflows in fixed income. Of the total, CHF 5.8 billion flowed out of money market funds, which tend to experience larger quarterly swings than other asset classes. The Swiss retail banking business recorded net new money inflows of CHF 2.7 billion in first quarter, primarily relating to increased inflows from existing clients.

196.   Regarding operational risks, Defendants stated, in relevant part:

Operational losses can be caused by external factors, deliberate, accidental or natural, or failures of internal processes, people or systems. They can unfortunately never be entirely eliminated.

Especially in today's environment of complex global processes, low regulatory tolerance for error, and growing propensity for litigation, operational risk runs alongside market and credit risk as one of UB S's principal risk classes.

Our operational risk framework, into which we have been investing considerable management time and effort, aims to contain the levels of risk, and to ensure that we have sufficient information to make informed decisions about additional or adjusted controls.

As far as accounting for operational risks is concerned, many potential causes of loss are identified before the probability, timing, or amounts of future cost are known with certainty. IFRS (International Financial Reporting Standards) requires us to make a provision, based on the best estimate of a liability, when it is probable that a payment will be required, even if the amount to be paid has not yet been exactly determined. This requires the exercise of judgment. Once we are able to quantify any potential operational risk more accurately, the corresponding provision is revised up or down.

197.    Regarding the Wealth Management segment, Defendants stated, in relevant

part:

Global Wealth Management & Business Banking's pre-tax profit was a record CHF 2,244 million in first quarter 2007, an increase of 3% from fourth quarter 2006. Pre-tax profit for the international and Swiss wealth management businesses, at an all-time high of CHF 1,501 million, was up 6% from fourth quarter 2006. Wealth Management US's pre-tax profit was CHF 171 million, down slightly from fourth quarter 2006. Net new money inflows from the wealth management businesses were CHF 44.8 billion in first quarter, more than double last quarter's performance. Business Banking Switzerland's pre-tax profit was CHF 572 million, down 4% from fourth quarter 2006.

*      *      *

Net new money in first quarter 2007 was at an all-time high of CHF 33.9 billion, up from CHF 19.0 billion in fourth quarter 2006. The international clients area reported inflows of CHF 29.4 billion, with strong contributions from all regions. The Swiss clients area showed a record inflow of CHF 4.5 billion, up from CHF 0.1 billion in fourth quarter 2006, reflecting solid inflows in all client

segments and in Geneva, Zurich, and Northern and Western Switzerland.

198.    On July 6, 2007, UBS announced that Defendant Weil would be taking control of the Wealth Management unit. The release stated, in relevant part:

UBS senior executive management changes

The Board of Directors has appointed Marcel Rohner as UBS's Group Chief Executive Officer, effective today. He succeeds Peter Wuffli, who relinquishes all of his functions at UBS. Raoul Weil will succeed Marcel Rohner as Chairman and CEO of Global Wealth Management & Business Banking. Marcel Ospel will be nominated for another term as Chairman of the Board of Directors once his current term expires.

Zurich/Basel, 6 July 2007 -Effective today, the Board of Directors has named UBS Deputy Group CEO Marcel Rohner as UBS Group CEO. Marcel Rohner has been a member of the Group Executive Board since 2002 and was named Deputy Group CEO in January 2006. As Chairman and CEO of Global Wealth Management & Business Banking, he has, over the last few years, managed the business that has made the largest contribution to the firm's revenues and profit UBS's current Group CEO, Peter Wuffli, will relinquish all of his functions at UBS and leave the bank. The new Chairman and CEO of Global Wealth Management & Business Banking will be Raoul Weil, member of the Group Executive Board and currently head of Wealth Management International.

Marcel Ospel will continue his strategic leadership at UBS as Chairman for at least another term. A year ago, as part of UBS's systematic management succession planning, Marcel Ospel expressed a wish to initiate a generational change of management at UBS and therefore retire from his function within the foreseeable future. He also proposed that Peter Wuffli be nominated his successor. After careful evaluation, the Board of Directors decided not to accept his proposal. It does not view the succession of the CEO to the position of Chairman as automatic. Instead, the Board identifies independently the composition of the leadership team which, in its opinion, suits the bank the best. In this context, it asked Marcel Ospel to serve for at least another term of three years as Chairman of the Board of Directors.

The Board of Directors and Peter Wuffli therefore decided to institute generational change only in UBS's operational management. Peter Wuffli will transfer all his functions, effective immediately, to Marcel Rohner, his deputy. The Board of Directors is extremely grateful to Peter Wuffli for his substantial contribution

to the growth of UBS, especially to the expansion of its franchise, market position and brand strength.

199.    On August 14, 2007, UBS filed with the SEC its quarterly report for the second quarter of 2007 on Form 6-K. Defendant Rohner signed the report. Defendants reported operating income for the three months ending June 30, 2007 of CHF 15.651 billion, net profit of CHF 5.622 billion and diluted EPS of CHF 2.69.

200.    In a letter to shareholders, Defendants Ospel and Rohner stated, in relevant part:

Net fee and commission income reached a record high in second quarter 2007. At CHF 8,099 million, it represented 52% of operating income. The result was 26% higher than in the same quarter of 2006, and driven by improvements in practically all fee categories. The investment banking business saw a very strong rise in M&A and corporate finance fees and higher equity and debt underwriting fees. One measure of the strength of our market position is our global market share. According to *Dealogic,* this improved to 5.8% in first half 2007 from 4.9% a year earlier. We grew faster than the 21.3% rate of the overall fee pool and our rank rose to fourth from eighth. We achieved market share gains in all regions and product lines. Invested asset levels rose to CHF 3.3 trillion, and, as a result, asset-based fees in our asset and wealth management businesses rose.

***Net new money inflows in second quarter 2007 remained strong. In our wealth management units, inflows totaled CHF 35.2 billion, with strong contributions from all markets***. The asset management business, however, saw net outflows of CHF 2.0 billion. This reflected the redemption of the DRCM outside investor interests (CHF 1.5 billion) and net outflows from institutional equity mandates - which were partly offset by inflows into multi-asset mandates, alternative and quantitative investments and real estate. In first half 2007 and for the whole of UBS, the inflows of net new money totaled CHF 86.8 billion compared with CHF 84.3 billion in first half 2006clearly demonstrating the strength of our wealth and asset management capabilities.

*        *        *

As you know, we are working on a number of growth initiatives that are at various stages of implementation. ***Among them are the expansion of the European wealth management business and US wealth management, together with investment in the Investment***

***Bank fixed income businesses, where we recently appointed Andre Esteves as the new head.*** The basic strategy of these initiatives remains unchanged. In implementing them, however, we need to balance revenue opportunities with operational and economic efficiency. Thus, the tactics involved in executing our growth strategy will continue to be adapted to varying market conditions.

(Emphasis added.)

201.   Regarding NNM, Defendants stated, in relevant part:

[N]et new money of CHF 34.0 billion in second quarter 2007, down from CHF 36.3 billion in the same period a year earlier. The wealth management units recorded inflows of CHF 35.2 billion this quarter, up from CHF 31.2 billion in second quarter 2006. Inflows in the international and Swiss wealth management business rose by CHF 2.2 billion to CHF 32.7 billion, with strong contributions from all regions. Net new money in European wealth management was CHF 2.6 billion in second quarter 2007, down from CHF 7.2 billion in second quarter a year earlier, reflecting lower contributions from all markets except Germany and Italy. Inflows into our domestic wealth management business in the US were CHF 2.5 billion in second quarter, up from CHF 0.7 billion a year earlier, but down from CHF 10.9 billion in first quarter 2007. The second quarter is usually the weakest of the year, associated with the timing of US tax payments by clients. The asset management business saw outflows of CHF 2.0 billion, down from an inflow of CHF 3.6 billion a year earlier. Institutional clients reported an outflow of CHF 2.5 billion, of which CHF 1.5 billion was related to the redemption of DRCM outside investor interests. Net outflows from equity mandates were partly offset by inflows into multi-asset mandates, alternative and quantitative investments and real estate. The wholesale intermediary business saw an inflow of CHF 0.5 billion, up from the same quarter a year earlier, which saw equities and fixed income outflows. Total money market funds, which tend to experience larger quarterly swings than other asset classes, recorded inflows of CHF 1.2 billion. The Swiss retail banking business recorded net new money inflows of CHF 0.8 billion in second quarter compared with CHF 1.5 billion in the same period a year earlier, mainly due to lower inflows from corporate clients. UBS net new money in first half 2007 was CHF 86.8 billion, up CHF 2.5 billion from the same period a year earlier, with the increase driven by higher inflows in our wealth management businesses (up CHF 15.2 billion), but partly offset by lower inflows from institutional clients in the asset management business (down CHF 11.8 billion).

202.    Regarding operational risks, Defendants made substantially the same disclosure as that issued in the Company's quarterly report for the first quarter of 2007.

203.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

> Global Wealth Management & Business Banking's pre-tax profit was a record CHF 2,341 million in second quarter 2007, an increase of 4% from first quarter 2007. Pre-tax profit for the international and Swiss wealth management businesses, at an all-time high of CHF 1,543 million, was up 3% from first quarter. Wealth Management US's pre-tax profit was CHF 161 million, down 6% from first quarter, affected by legal and litigation expenses. Business Banking Switzerland's pre-tax profit was a record CHF 637 million, up 11 from the previous quarter.
>
> *       *       *
>
> Net new money in second quarter 2007 was CHF 32.7 billion, slightly below the record intake of CHF 33.9 billion in first quarter. This was the second best quarterly result ever. The international clients area reported inflows of CHF 30.1 billion, with strong contributions from all regions. The Swiss clients area showed an inflow of CHF 2.6 billion, down from the record CHF 4.5 billion in first quarter.
>
> In first half 2007, net new money was a record CHF 66.6 billion, compared with CHF 55.2 billion in first half 2006, reflecting increases in most geographical regions, particularly in Asia and the Americas.

204.    On October 1, 2007, UBS filed with the SEC its Midyear Report for 2007 on Form 6-K. Defendant Rohner signed the report. Defendants reported operating income for the six months ending June 30, 2007 of CHF 28.998 billion, net profit of CHF 8.859 billion and diluted earnings per share of CHF 4.17.

205.    Regarding NNM, Defendants stated, in relevant part:

> [I]nflows of net new money totaled CHF 86.8 billion compared with CHF 84.3 billion in first half 2006, with the strong increase in inflows from the wealth management businesses being partly

offset by lower institutional inflows into the asset management business.

206.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

In first half 2007, net new money was a record CHF 66.6 billion, compared with CHF 55.2 billion in first half 2006, reflecting increases in most geographical regions, particularly in Asia.

\*          \*          \*

Results

First half 2007 pre-tax profit, at a record CHF 3,044 million, rose 19% compared with first half 2006.

207.    On October 30, 2007, UBS filed with the SEC its quarterly report for the third quarter of 2007 on Form 6-K. Defendant Rohner signed the report. Defendants reported operating income for the three months ending September 30, 2007 of CHF 6.169 billion, net profit (loss) of CHF (726) billion and diluted earnings (loss) per share of CHF (0.49).

208.    In a letter to shareholders, Defendants Ospel and Rohner stated, in relevant part:

We closed the quarter with a loss for the group, before tax and minority interests, of CHF 726 million. This is within the range of CHF 600 to 800 million we indicated in the announcement. After tax and minority interests, this results in a loss of CHF 830 million attributable to shareholders. It means that, for the first time for many quarters, we have not met our return on equity target. Excluding the gain from the sale of our Julius Baer stake in second quarter 2007 and costs related to the closure of DRCM (post-tax CHF 229 million), annualized RoE for the first three quarters of the year was 17.2% - the lowest level since 2003 and below our revised objective of a minimum return of 20% over the cycle.

\*          \*          \*

As our shareholders, you expect us to manage UBS to produce profitable growth. To us, this means: establishing a set of earnings streams that are based on true customer benefit, building a strong and growing client base, and maintaining unique assets and capabilities that are hard for competitors to copy.

\*       \*       \*

*The losses in a few areas in our Investment Bank outweighed the sustained strength in all our other businesses. Our wealth management businesses had an excellent quarter, with record levels of profitability.* Their asset gathering performance remained strong, with inflows of net new money totalling CHF 40.2 billion in the quarter. Fees in both wealth and asset management remained high, driven by the level of invested assets, which stood at CHF 3.1 trillion on 30 September 2007.

For the whole of UBS, net fee and commission income was significantly higher than the levels recorded in third quarter 2006 and only slightly below the all-time high set in second quarter 2007. On top of strong performance in wealth management and asset management, fee and commission income was also boosted by year on year gains in the Investment Bank's equity underwriting and corporate advisory business, plus strong commissions in our equity cash business. Revenues also rose, year on year, in some of our trading businesses, in particular equity derivatives, prime brokerage, rates derivatives, and government bonds as well as the client-facing distribution area of our money market, currencies and commodities business.

*Continued strong fee and commission income reflects our structural strengths.* By operating together, each business group achieves higher revenues and lower costs, and sees increased client referrals. The market opportunity presented by the record level of wealth creation around the world continues to grow. Our task now is to make the most of the tremendous potential for profitable growth offered by UBS's structure and market position.

(Emphasis added.)

209.   Regarding NNM, Defendants stated, in relevant part:

[N]et new money of CHF 38.3 billion in third quarter 2007, down from CHF 41.9 billion in the same period a year earlier. The wealth management units recorded inflows of CHF 40.2 billion this quarter, up from CHF 26.8 billion in third quarter 2006. Inflows in the international and Swiss wealth management business rose by CHF 11.7 billion to CHF 35.1 billion, with strong contributions from all regions. Net new money in European wealth management was a record CHF 7.3 billion in third quarter 2007, up from CHF 2.7 billion in third quarter a year earlier, reflecting stronger contributions from all markets except Italy. *Inflows into our domestic wealth management business in the US were CHF 5.1 billion in third quarter, up from CHF 3.4 billion a year earlier as*

> *we saw inflows from new clients, driven by an increased number of financial advisors.* The asset management business saw a CHF 2.8 billion net outflow in total for the institutional and the wholesale intermediary business, sharply down from the strong inflow of CHF 15.5 billion a year earlier. The institutional clients business suffered from outflows in certain underperforming equity mandates, which were partly offset by inflows into alternative and quantitative investments as well as multi-assets. We experienced outflows from fixed income funds in our wholesale intermediary business, which were only partly offset by inflows into other asset classes. The Swiss retail banking business recorded net new money inflows of CHF 0.9 billion in third quarter compared with an outflow of CHF 0.4 billion in the same period a year earlier, mainly due to higher inflows from existing clients.
>
> (Emphasis added.)

210.   Regarding operational risks, Defendants made substantially the same disclosure as that issued in the Company's quarterly report for the first quarter of 2007, however this quarter's disclosure included a statement on the risks associated with the sub-prime mortgage market.

211.   Regarding the Wealth Management segment, Defendants stated, in relevant part:

> Global Wealth Management & Business Banking's pre-tax profit was a record CHF 2,388 million in third quarter 2007, an increase of CHF 47 million, or 2%, from second quarter 2007. Pre-tax profit for the international and Swiss wealth management businesses, at an all-time high of CHF 1,616 million, was up 5% from second quarter. Wealth Management US's pre-tax profit was CHF 181 million, up 12% from second quarter. In US dollar terms, it rose 14% to a record USD 151 million. Net new money inflows from the wealth management businesses were CHF 40.2 billion in third quarter, up 14% from last quarter. Business Banking Switzerland's pre-tax profit was CHF 591 million, down 7% from the second quarter.
>
> *       *       *
>
> Net new money in third quarter 2007 was a record CHF 3 5.1 billion, up from CHF 32.7 billion in second quarter. The international clients area reported inflows of CHF 33.3 billion, up from CHF 30.1 billion, with strong contributions from all regions. The Swiss clients area showed an inflow of CHF 1.8 billion, down from CHF 2.6 billion in second quarter.
>
> Inflows for the first nine months of 2007 totaled CHF 101.7 billion, reflecting an annualized net new money intake rate of 12% of the

underlying asset base at year-end 2006, with positive contributions coming from all markets.

*        *        *

Results

In third quarter 2007, pre-tax profit, at a record CHF 1,616 million, was up 5% from CHF 1,543 million in second quarter.

212.   On January 30, 2008, UBS pre-announced its full year and fourth quarter 2007 results. In the press release, the Company announced an anticipated net loss of CHF 12.5 billion for the fourth quarter and a net loss of CHF 4.4 billion for all of 2007.

213.   On February 14, 2008, UBS filed its quarterly report for the fourth quarter of 2007 with the SEC on Form 6-K. Defendant Rohner signed the report. Defendants reported operating income (loss) for the three months ending December 31, 2007 of CHF (4.135) billion, net profit (loss) of CHF (12.451) billion and diluted earnings (loss) per share of CHF (6.53).

214.   In a letter to shareholders, Defendants Ospel and Rohner stated, in relevant part:

Last year was one of the most difficult in our history. When we announced our results for the first six months of the year, with a net profit of CHF 8,897 million, it looked as if we were heading for another record year. While most of our businesses, in particular our wealth management businesses, continued their strong revenue and profit growth momentum and finished the year with record results, these bright spots were overshadowed by the devastating development in our Investment Bank's US residential mortgage business. The sudden and serious deterioration in the US housing market, in combination with our large exposure in sub-prime mortgage-related securities and derivatives, has deeply impacted us.

*        *        *

*The wealth management business recorded total net new money inflows of CHF 31.5 billion in fourth quarter, bringing our full-year total for these businesses to CHF 151.7 billion. Profitability was high in fourth quarter, with record performances in Wealth Management International & Switzerland and our domestic US business.*

215.    Regarding Net New Money, Defendants stated, in relevant part:

[N]et new money of CHF 15.5 billion, down from CHF 25.5 billion in fourth quarter a year earlier. The decrease was driven by net outflows in the asset management business of CHF 16.2 billion, down from net inflows of CHF 5.5 billion a year earlier. CHF 15.3 billion of the outflow was from institutional clients in equities, fixed income and multi-asset products. These outflows were more than offset by strong inflows into the wealth management units. These reported net new money inflows of CHF 31.5 billion in fourth quarter 2007, up from CHF 21.7 billion in fourth quarter 2006, reflecting strong inflows from Europe, as well as increased inflows in the domestic wealth management business in the US. Overall, UBS's net new money for full-year 2007 was CHF 140.6 billion, down from a record CHF 151.7 billion in full-year 2006. The decrease was mainly driven by full-year outflows in institutional asset management of CHF 16.3 billion. The Swiss and international wealth management businesses (up CHF 27.5 billion) and the domestic wealth management business in the US (up CHF 10.9 billion) recorded very strong inflows in the same period.

216.    Regarding operational risks, Defendants made substantially the same disclosure as that issued in the Company's quarterly report for the first quarter of 2007.

217.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

Pre-tax profit in Global Wealth Management & Business Banking was a record CHF 2,511 million in fourth quarter 2007. This is an increase of CHF 123 million, or 5%, from third quarter 2007 and reflects record results across all three business units. Net new money inflows from the wealth management businesses were CHF 31.5 billion in fourth quarter, down from CHF 40.2 billion last quarter, but at an all-time high for a fourth quarter.

\*        \*        \*

In Switzerland, Business Banking has been merged with Wealth Management Switzerland into a new business area called Wealth Management & Business Banking Switzerland. This change in management structure has not affected the reporting structure of the business as presented in UBS's quarterly and annual financial reports.

\*        \*        \*

Net new money in fourth quarter 2007 was CHF 23.4 billion, down from CHF 35.1 billion in third quarter 2007, but at a record for a fourth quarter. The international clients area reported inflows of CHF 22.8 billion, down from CHF 33.3 billion in third quarter 2007, with positive contributions from all geographical regions. The Swiss clients area showed an inflow of CHF 0.6 billion, down from an inflow of CHF 1.8 billion in third quarter 2007, with the decline reflecting normal end-of-year outflows.

In full-year 2007, net new money stood at a record CHF 125.1 billion with positive inflows from all geographical regions, compared with CHF 97.6 billion in full-year 2006. While the highest inflows came from Europe and Asia Pacific, the Americas also demonstrated a strong growth rate for this period.

\*     \*     \*

European wealth management

The inflow of net new money was CHF 3.1 billion in fourth quarter 2007, down from the record CHF 7.3 billion in third quarter 2007. In full-year 2007, net new money intake into the domestic European network totaled CHF 18.4 billion, up I% from the 2006 inflow of CHF 18.2 billion, reflecting an annual net new money growth rate of 13% of the underlying asset base at year-end 2006. The strongest inflows were from Germany, the UK and Italy.

\*     \*     \*

Results

Full-year 2007 pre-tax profit, at a record CHF 6,306 million, rose 21% compared with 2006. Total operating income was up 19% in 2007, reflecting a higher asset base and increased collateralized lending volumes and more client activity. Operating expenses, up 17% in 2007 from 2006, also rose as our business expanded.

In fourth quarter 2007, pre-tax profit, at a record CHF 1,646 million, was up 2% from CHF 1,616 million in third quarter.

218.   On March 18, 2008, UBS filed its annual report for 2007 with the SEC on Form 20-F. Defendant Rohner signed the report. He also signed SOX certifications in connection with the report.

219.   For the twelve months ending December 31, 2007, Defendants reported operating income of CHF 31.980 billion, net profit (loss) of CHF (4.384) billion and basic earnings (loss) per share of (2.28).

220.    In a letter to shareholders, Defendants Ospel and Rohner stated, in relevant part:

> Wealth and asset management delivered excellent results in 2007. Global Wealth Management & Business Banking produced record results in both net new money inflow, at CHF 156 billion, and profitability.

221.    Regarding NNM, Defendants stated, in relevant part:

> [N]et new money at CHF 140.6 billion, down from a record in 2006 of CHF 151.7 billion. The decrease was mostly driven by full-year outflows in Global Asset Management, mainly in institutional which had net new money out-flows of CHF 16.3 billion. The net new money outflows in core/ value equity mandates and, to a lesser extent, in fixed income mandates were only partly offset by net new money inflows into all other asset classes, particularly alternative and quantitative investments and money market funds. Record net new money inflows were seen in Swiss and international wealth management (where net new money inflows increased by CHF 27.5 billion from 2006), particularly in Europe and Asia Pacific. Net new money inflows of CHF 26.6 billion in the US wealth management business were an increase of CHF 10.9 billion from prior year, reflecting the recruitment of experienced advisors and reduced outflows from existing clients. The Swiss retail business recorded net new money inflows of CHF 4.6 billion.

222.    Regarding corporate responsibility, Defendants stated, in relevant part:

> Corporate responsibility is integral to the way UBS does business

> *       *       *

> As a leading financial services firm, one of UBS's main purposes is to create long-term value. UBS believes this can be best achieved by providing clients with value-added products and services and by promoting a corporate culture that adheres to high ethical standards. The firm also firmly believes that, for any business, long-term value creation is also dependent on what it does above and beyond what laws and regulations require. It is why UBS dedicates itself to creating a working environment based on the values of equal opportunity, diversity and meritocracy.

> *       *       *

> Corporate responsibility governance

84

The Corporate Responsibility Committee, a Board of Directors (BoD) committee, was created in 2001 and assesses how to meet the evolving expectations of UBS's stakeholders in relation to the firm's corporate conduct. If the Corporate Responsibility Committee concludes that there is a gap between what stakeholders expect and what UBS practices - and that this gap represents either a risk or an opportunity to the firm it suggests appropriate actions to the Group Executive Board (GEB).

The Corporate Responsibility Committee is chaired by Stephan Haeringer, Executive Vice-Chairman of UBS. It includes another member of the BoD, eight senior UBS executives representing UBS businesses, and a number of corporate functions, including legal and communications. The committee meets two to three times a year. It is supported by a working group that comprises 22 functional experts from all UBS business groups and is chaired by the firm's Chief Communication Officer, a member of the Corporate Responsibility Committee.

Neither the Corporate Responsibility Committee nor the working group runs operational processes related to corporate responsibility; it is the GEB that has overall responsibility for corporate responsibility strategy and that decides on specific corporate responsibility measures. The implementation of these measures is then undertaken within existing processes in the different business groups.

For example, the GEB is responsible for UBS's environmental policy and nominates a Group Environmental Representative. Each business group also nominates a representative, and together with the Group Representative, they form a committee that oversees the implementation of UBS's environmental policy. This committee also provides guidance to the different business groups in their implementation of "UBS's Statement on Human Rights". It is chaired by the Group Chief Credit Officer and is supported by coordinators and functional units across the business groups.

Corporate responsibility: training and raising awareness

It is important that employees are aware of UBS's corporate responsibility efforts and processes. Apart from the general information published on the firm's intranet and website, in 2007, UBS directly provided nearly 3,000 employees in all businesses with information on the approach taken by the firm towards corporate responsibility through a range of training and awareness-raising activities. They extended from short presentations, in particular at new employee induction events, to longer presentations and workshops. In Global Wealth Management & Business Banking, for example, a module on ethics, corporate and

personal responsibility forms part of the business group's management training program.

Training is also integral to the more specialized areas of environmental management and anti-money laundering (AML). AML and compliance staff have to complete mandatory training every two years, and all new joiners go through an AML and compliance induction training. In 2007, 6,000 employees participated in training on environmental issues.

223.    Regarding Wealth Management International & Switzerland, Defendants stated, in relevant part:

> ***2007 was a record year in terms of profitability, net new money intake and invested assets***
>
> \*     \*     \*
>
> In 2007, net new money was a record CHF 125.1 billion, compared with CHF 97.6 billion in 2006, representing an annual growth rate of 11% of the underlying invested asset base at end-2006. This outstanding result reflected increases in all geographical regions throughout the year, particularly in Asia Pacific and Americas, both a result of the growth strategy.
>
> \*     \*     \*
>
> Results
>
> In 2007 pre-tax profit, at a record CHF 6,306 million, rose 21% compared with 2006. Total operating income was up 19% in 2007, reflecting a higher asset base and increased collateralized lending volumes and more client activity. Operating expenses, up 17% in 2007 from 2006, also rose as the business expanded.
>
> (Emphasis added.)

224.    Regarding risk control, Defendants made the following statements, in relevant part:

> UBS's risk management and control frameworks are based on business management accountability and independent risk control for credit, market, liquidity, funding and operational risks.
>
> \*     \*     \*
>
> Taking, managing and controlling risk is core to UBS's business. The aim is not, therefore, to eliminate all risks but to achieve an appropriate balance between risk and return. UBS's approach to risk management and control is based on five principles....

225.    Regarding operational risks, Defendants made substantially the same disclosure as that issued in the Company's 2006 Annual Report.

226.    Regarding regulation and supervision, Defendants stated, in relevant part:

> UBS aims to comply with all applicable provisions and to work closely and maintain good relations with regulators in all jurisdictions where the firm conducts business.
>
> Regulation and supervision in the US
>
> Banking regulation
>
> UBS's operations in the US are subject to a variety of regulatory regimes. It maintains branches in California, Connecticut, Illinois, New York and Florida. UBS's branches located in California, New York and Florida are federally licensed by the Office of the Comptroller of the Currency. US branches located in Connecticut and Illinois are licensed by the state banking authority of the state in which the branch is located. Each US branch is subject to regulation and examination by its licensing authority. In addition, the Board of Governors of the Federal Reserve System exercises examination and regulatory authority over UBS's state-licensed US branches. The firm also maintains state and federally chartered trust companies and other limited purpose banks, which are regulated by state regulators or the Office of the Comptroller of the Currency. Only the deposits of UBS's subsidiary bank located in the state of Utah are insured by the Federal Deposit Insurance Corporation. The regulation of the firm's US branches and subsidiaries imposes restrictions on the activities of those branches and subsidiaries, as well as prudential restrictions, such as limits on extensions of credit to a single borrower, including UBS subsidiaries and affiliates.
>
> The licensing authority of each US branch has the authority to take possession of the business and property of UBS located in the state of the office it licenses in certain circumstances. Such circumstances generally include violations of law, unsafe business practices and insolvency. As long as UBS maintains one or more federal branches, the Office of the Comptroller of the Currency also has the authority to take possession of the US operations of UBS AG under similar circumstances, and this federal power may preempt the state insolvency regimes that would otherwise be applicable to UBS's state-licensed branches. As a result, if the Office of the Comptroller of the Currency exercised its authority over the US branches of UB S AG pursuant to federal law in the event of a UBS insolvency, all of UBS's US assets would most

likely be applied first to satisfy creditors of its US branches as a group, and then made available for application pursuant to any Swiss insolvency proceeding.

In addition to the direct regulation of its US banking offices, UBS is subjected to oversight regulation by the Board of Governors of the Federal Reserve System under various laws (including the International Banking Act of 1978 and the Bank Holding Company Act of 1956) because it operates US branches. On 10 April 2000, UBS AG was designated a "financial holding company" under the Bank Holding Company Act of 1956. Financial holding companies may engage in a broader spectrum of activities, including underwriting and dealing in securities. To maintain its financial holding company status, UBS, its US subsidiary federally chartered trust company and its US subsidiary bank located in Utah are required to meet or exceed certain capital ratios and UBS's US branches, its US subsidiary federally chartered trust company, and its US subsidiary bank located in Utah are required to meet or exceed certain examination ratings. A major focus of US governmental policy relating to financial institutions in recent years has been aimed at fighting money laundering and terrorist financing. Regulations applicable to UBS and its subsidiaries impose obligations to maintain appropriate policies, procedures and controls to detect, prevent and report money laundering and terrorist financing and to verify the identity of their customers. Failure of a financial institution to maintain and implement adequate programs to combat money laundering and terrorist financing could have serious consequences for the firm, both in legal terms and in terms of its reputation.

*       *       *

UBS aims to comply with all relevant standards on corporate governance. As a foreign company listed on the New York Stock Exchange, the firm is only required to comply with the rules relating to audit committees and annual certifications. UBS, however, has voluntarily adopted the overwhelming majority of the New York Stock Exchange rules for US companies.

227.    On April 1, 2008, UBS pre-announced an estimated loss of CHF 12 billion for the first quarter of 2008. In the release, the Company announced, "[lor the first quarter 2008, Global Wealth Management & Business Banking expects to have achieved positive net new money. Global Asset Management expects to report net new money outflows."

228.   UBS issued a second press release on April 1, 2008 announcing that Defendant Ospel would not seek reelection to the Board and that Defendant Kurer was his recommended successor. The release stated, in relevant part:

> Marcel Ospel will not be standing for re-election to the Board of Directors of UBS.
>
> *      *      *
>
> Marcel Ospel, Chairman of the Board of UBS, has decided to withdraw his candidacy for re-election to the Board at the Annual General Meeting on 23 April 2008. The Board of Directors has accepted its Chairman's decision with regret. At the same time, the Board proposes that the Annual General Meeting elect Peter Kurer to the Board to succeed Marcel Ospel as Chairman.

229.   The statements in UBS's quarterly and annual reports for fiscal 2007 set forth above were false and misleading because:

(a)   Defendants intentionally failed to disclose that the operating income, net profit, EPS and other performance indicators reported by Defendants were materially improved as a direct result of revenues derived from monies funneled to UBS as part of the Company's fraudulent tax evasion scheme about which Defendants knew and encouraged;

(b)   Defendants intentionally failed to disclose that a materially significant contribution to the Company's NNM performance indicator each quarter and annually was derived from Defendants' tax evasion scheme; and

(c)   Defendants knew their fraudulent tax evasion scheme violated a number of rules and regulations in the U.S. and abroad and rendered their quarterly and annual reports false and misleading.

230.   On May 6, 2008, UBS filed with the SEC its quarterly report for the first quarter of 2008 on Form 6-K. Defendant Rohner signed the report. Defendants recorded operating income (loss) for the three months ending March 31, 2008 of CHF (3.952) billion, net profit (loss) of CHF (11.535) billion and diluted earnings (loss) per share of CHF (5.63).

231.   In a letter to shareholders, Defendants Kurer and Rohner stated, in relevant

part:

> As pre-announced on 1 April 2008, UBS recorded a loss
> attributable to shareholders of CHF 11.5 billion in first quarter
> 2008, with losses on US mortgage market and related structured
> credit positions again heavily impacting results in our Investment
> Bank's fixed income, currencies and commodities (FICC) business.
>
> *     *     *
>
> **While profit levels reduced in our wealth and asset management
> businesses and Business Banking Switzerland, in comparison
> with fourth quarter 2007, they remained high in absolute terms.**
>
> (Emphasis added.)

232.   Regarding NNM, Defendants stated:

> [N]et new money outflows of CHF 12.8 billion, compared with
> inflows of CHF 52.8 billion a year earlier. The decline in Group
> net new money for first quarter 2008, compared with first quarter
> 2007, is the cumulative result of lower asset-gathering levels across
> all business groups. Global Asset Management was most affected,
> and saw total net new money outflows of CHF 16.5 billion in first
> quarter 2008, mainly the consequence of underperformance in
> certain investment capabilities in prior quarters and the generally
> unsettled investment environment. Institutional clients had a net
> outflow of CHF 9.6 billion, with outflows in core / value equity
> strategies, some multi-asset mandates, fixed income and alternative
> and quantitative investments only partially offset by strong inflows
> into money market funds and passive and growth equities
> mandates. In addition, wholesale intermediary recorded net
> outflows of CHF 6.9 billion in multi-asset, equities funds and other
> fixed income. Business Banking Switzerland recorded net outflows
> of CHF 1.9 billion, down from net new money inflows of CHF 2.7
> billion in first quarter 2007. The two wealth management units
> made a combined positive contribution of CHF 5.6 billion to the
> overall net new money results - well below CHF 44.8 billion in the
> same quarter a year earlier. A more subdued economic climate and
> slowdown in financial market activity led to slower creation in
> personal wealth, reducing the level of net new money inflows into
> the international business. In Switzerland, UBS felt the negative
> impact of its financial losses on its reputation, with clients
> diversifying part of their assets away from UBS. Overall, however,
> it affected only a small fraction of UBS's total invested assets base.

233.    Regarding operational risks, Defendants made substantially the same disclosure as that issued in the Company's quarterly report for the first quarter of 2007.

234.    Regarding the Wealth Management segment, Defendants stated, in relevant part:

> Global Wealth Management & Business Banking achieved a pre-tax profit of CHF 2,152 million in first quarter 2008, a decrease of 13% from the prior quarter. In comparison with fourth quarter 2007, each business area reported lower pre-tax profits: the international and Swiss wealth management businesses reported a 13% decline to CHF 1,429 million, Wealth Management US saw a 12% decline to CHF 183 million and Business Banking Switzerland saw a 10% decline to CHF 540 million. Net new money inflows from the wealth management businesses were CHF 5.6 billion in first quarter 2008, down 82% from the prior quarter.
>
> *        *        *
>
> Net new money declined to CHF 2.5 billion in first quarter 2008 from CHF 23.4 billion the previous quarter. This reflects slower wealth creation in a tougher economic climate, a near absence of corporate events creating large one-time increases in entrepreneurial wealth, the impact of modest deleveraging of private client portfolios and, in Switzerland, clients diversifying assets away from UBS due to the effects of the credit market turbulence on the firm's operating performance and reputation.
>
> *        *        *
>
> Results
>
> Pre-tax profit for first quarter 2008 was CHF 1,429 million, a 13% decrease from CHF 1,652 million the previous quarter. The decrease occurred as the asset base decreased in first quarter 2008 and this led to lower income through asset-based fees.

235.    The statements in UBS's quarterly report for the first quarter of 2008 set forth above were false and misleading because:

(a)    Defendants intentionally failed to disclose that the operating income, net profit, EPS and other performance indicators reported by Defendants were materially improved as a direct result of revenues derived from monies funneled to UBS as part of the Company's fraudulent tax evasion scheme about which Defendants knew and encouraged;

(b)      Defendants intentionally failed to disclose that a materially significant contribution to the Company's NNM performance indicator each quarter and annually was derived from Defendants' tax evasion scheme; and

(c)      Defendants knew their fraudulent tax evasion scheme violated a number of rules and regulations in the U.S. and abroad and rendered their quarterly and annual reports false and misleading.

### The Truth Emerges

236.      On May 6, 2008, UBS announced, in relevant part:

> *The Department of Justice ("DOJ") and the SEC are examining UBS's conduct in relation to cross-border services provided by Swiss-based UBS client advisors to US clients during the years 2000-2007.* In particular, DOJ is examining whether certain US clients sought, with the assistance of UBS client advisors, to evade their US tax obligations by avoiding restrictions on their securities investments imposed by the Qualified Intermediary agreement UBS entered into with the US Internal Revenue Service in 2001. The SEC is examining whether Swiss-based UBS client advisors engaged in activities in relation to their US-domiciled clients that triggered an obligation for UBS Switzerland to register with the SEC as a broker-dealer and/or investment advisor. UBS is cooperating with these investigations.

(Emphasis added.)

237.      Following the Company's announcement, *The Financial Times* identified Defendant Liechti, head of UBS's international wealth management business, as having been retained in connection with the U.S. government probe. *The Financial Times* reported, "[p]eople close to the situation said the detention was an aggressive tactic and may have been chosen by the authorities to put pressure on UBS and its employees to reveal its business practices."

238.      *Bloomberg.com* quoted an analyst stating, "UBS has been hit by the perfect storm.... Clients may run away if they think they'll leak information to tax authorities in Germany and the U.S." The article added, "[c]lients pulled a net 12.8 billion francs ($12.1

billion) from UBS's asset-and-wealth-management units in the first quarter, the first withdrawal in almost eight years as the bank's writedowns swelled to $38 billion."

239.    UBS's May 6, 2008 disclosure served as a partial corrective disclosure of UBS's misrepresentations concerning its adherence to high ethical standards and applicable legal requirements. As a result of this news, the next day, when the news was published in the U.S., UBS shares trading on the NYSE fell $2.72, or 5.09%, to close at $28.99 on May 8, 2008.

240.    On May 13, 2008, a federal judge in the Southern District of Florida unsealed an indictment which charged Birkenfeld with conspiracy to commit tax fraud. While with UBS, Birkenfeld conspired with a California client to evade federal taxes by hiding $200 million in undeclared Swiss bank accounts.

241.    On this news, UBS shares declined 3% to close at $28.75 down from the previous close of $29.50.

242.    On May 14, 2008, an article in *The Wall Street Journal* stated "[t]he U.S. investigation threatens to taint UBS's private bank, which has more assets under management than any other in the world and has long prided itself on its ability to provide confidential services to the world's wealthiest."

243.    On May 27, 2008, in an article published in *The Financial Times* entitled "UBS Tells Unit Staff to Avoid US Visits," it was revealed that UBS had advised its employees to avoid traveling to the United States to prevent employees from being seized by federal authorities and from being swept into the investigation concerning UBS as a tax haven bank. According to the article, "UBS's travel restrictions suggest it is concerned that the investigations by the US Department of Justice and the Securities and Exchange Commission may widen."

244.    On this partial disclosure, UBS shares declined 7.2%, to $24.09.

245.    On June 19, 2008, Birkenfeld pled guilty to conspiracy to commit tax fraud. Regarding Birkenfeld's testimony, *The New York Times* stated, in relevant part:

One after another, the secrets spilled out. The millions stashed in Swiss bank accounts. The precious jewels and artwork whisked into hiding. The diamonds smuggled in a tube of toothpaste.

\*        \*        \*

Mr. Birkenfeld's testimony, the centerpiece of a widening investigation into UBS and its wealthy American clients, blew a hole in the wall of secrecy surrounding the world of Swiss banking. Under pressure from the authorities, UBS has been considering disclosing the names of thousands of its wealthy clients in the United States.

\*        \*        \*

The document reads like a how-to of high-end tax evasion. In a seven-page statement to the court, Mr. Birkenfeld, a 43-year-old American, said UBS bankers used a variety of ruses to court American clients and help them dodge taxes. The document reads like a how-to of high-end tax evasion.

\*        \*        \*

UBS advised bankers traveling to the United States to tell airport customs officials that the visit was for pleasure, not business, Mr. Birkenfeld said. The bank urged clients to destroy banking records to conceal their offshore accounts.

Some American clients were told to stash watches, jewelry and artwork that they had bought with money hidden offshore in safe deposit boxes in Switzerland. UBS also encouraged them to use Swiss credit cards so the Internal Revenue Service could not track their purchases, Mr. Birkenfeld said.

The list went on. Mr. Birkenfeld said that at times he served as a personal courier for his clients, spiriting checks out of the United States and depositing them in accounts in Denmark, Switzerland and Liechtenstein, away from the prying eyes of the I.R.S. At one point, he wrote, he even smuggled diamonds for a customer in a tube of toothpaste.

\*        \*        \*

**Prosecutors and lawyers for Mr. Birkenfeld contend that he was not a rogue employee but rather part of an broad effort by the bank to flout American tax laws with offshore banking services sold to wealthy Americans.**

"Our position is that Mr. Birkenfeld was working at UBS where people knew exactly what was going on," Mr. Onorato said after the hearing. "He's going to tell the government everything he

knows. He is going to cooperate with the government fully," he said, adding that Mr. Birkenfeld "had numerous U.S. clients."

(Emphasis added.)

246.    On this news, shares of UBS stock fell 4.3% to close at $23.07, on heavy trading volume.

247.    On July 1, 2008, the US District Court, Southern District of Florida, granted a petition filed by the United States for leave to serve a "John Doe" summons on UBS, under the authority of Title 26 U.S.C. §7609(f). This "John Doe Summons" identified the John Doe Class as:

> "United States taxpayers, who at any time during the years ended December 31, 2002 through December 31, 2007, had signature or other authority (including authority to withdraw funds; to make investment decisions; to receive account statements, trade confirmations, or other account information; or to receive advice or solicitations) with respect to any financial accounts maintained at, monitored by, or managed through any office in Switzerland of UBS AG or its subsidiaries or affiliates in Switzerland and for whom UBS AG or its subsidiaries or affiliates (1) did not have in its possession Forms W-9 executed by such United States taxpayers, and (2) had not filed timely and accurate Forms 1099 naming such United States taxpayers and reporting to United States taxing authorities all payments made to such United States taxpayers."

248.    On this news, UBS shares fell 4.01%, from a closing price of $20.66 on June 30, 2008 to $20.35 on July 1, 2008, on extremely heavy trading volume of more than 15.5 million shares.

249.    On July 17, 2008, UBS issued a press release announcing that Defendant Branson, the CFO of UBS's Wealth Management unit, had testified before the Senate Subcommittee in connection with its review of UBS. The release stated, in relevant part:

> UBS statement of Mark Branson before the permanent Senate Subcommittee of Investigation

UBS representative Mark Branson, Chief Financial Officer of Global Wealth Management & Business Banking, today testified at a US Senate Subcommittee hearing. The title of the hearing was "Tax Haven Banks and US Tax Compliance."

Zurich/Basel, 17 July 2008 - UBS is taking the actions necessary to address any compliance failures that may have occurred in the US cross-border business, says the statement delivered by Mark Branson on behalf of UBS, explaining that the bank has decided to exit entirely the business in question. "That means UBS will no longer provide offshore banking and securities services to US residents through its bank branches. Such services will only be provided to residents of this country through companies licensed in the United States," Branson told the Subcommittee.

Second, UBS is working with the US Government to identify the names of US clients who may have engaged in tax fraud. Client identity is generally protected from disclosure under Swiss law. But such privacy protections do not apply when disclosure of client names is requested in connection with an investigation of tax fraud and where the requests are presented to the Swiss government through established legal channels. UBS will fully support and assist that process.

At the hearing Branson also pointed out that the cross-border business under the QI Agreement was -- and is -- entirely legal in both Switzerland and the United States. Indeed, the QI expressly contemplated that US citizens could access bank accounts in Switzerland and other countries without providing a form W-9, as long as they held no US securities. Branson: "Unless or until those rules are changed, that is the framework with which we and other banks must comply."

Last year, in order to respond to the ongoing investigations of the US Department of Justice and the SEC, UBS launched a comprehensive internal investigation into its cross-border business with US customers. Branson: "We did have detailed written policies that prohibited our employees from engaging in some of the conduct that our internal investigation has uncovered, such as assisting in the creation of sham offshore companies to defraud tax authorities. While our own review is not complete, it is apparent now, that our controls and supervision were inadequate. UBS is committed to taking both corrective and disciplinary measures."

250.    The Senate Subcommittee released its report on "Tax Haven Banks and U.S. Tax Compliance," as set forth herein, which describes UBS's tax evasion scheme.

251.    On August 13, 2008, *The New York Times* reported that internal letters at UBS show that the Company's senior executives were aware of the tax fraud scheme as early as 2005. The article stated, in relevant part:

> *Senior executives at the Swiss bank UBS were alerted at least three years ago to possible violations of United States securities laws in dealings with American clients of its private bank, according to internal letters.*
>
> But the bank, now the subject of a widening investigation into whether it had violated securities and tax laws by helping wealthy Americans hide money overseas, ignored the earliest warnings from a former top banker, some of the letters show.
>
> The letters cast a new spotlight on senior executives of the company including: Marcel Rohner, who was head of the bank's global wealth management unit and has been chief executive since 2007; Peter Kurer, the bank's former top lawyer who is now its chairman; and several in-house lawyers and compliance officers, all of whom were copied on some of them.
>
> The four letters, which were disclosed by people who have seen them, indicate that top UBS executives were first alerted to potential problems by June 2005 - nearly three years before the Justice Department formally announced in May its investigation of the bank. The subject of one of the letters was reported by *The Financial Times*.
>
> Prosecutors suspect that UBS, the world's largest private bank, helped American clients park $20 billion in secret offshore accounts, evading $300 million or more in taxes.
>
> The letters consist of correspondence between Bradley C. Birkenfeld, a former top private banker for UBS, and Mr. Kurer, then the bank's general counsel.
>
> Mr. Birkenfeld is an American citizen who pleaded guilty in June to a conspiracy charge of helping a billionaire UBS client to evade taxes through undeclared offshore accounts. He resigned from UBS in November 2005.
>
> While the federal investigation into UBS has focused on Mr. Birkenfeld, who is cooperating with investigators, the letters are the first to highlight other names.
>
> The correspondence centers on a letter from Mr. Birkenfeld to Mr. Kurer on March 17, 2006, in which Mr. Birkenfeld writes about what he calls blatant inconsistencies in UBS's business practices.

In his letter, Mr. Birkenfeld tells Mr. Kurer that "I wish to bring to your attention a very important matter" under UBS's internal whistleblower rules.

Mr. Birkenfeld goes on to cite a three-page internal UBS legal document, dated November 2004, that he says contradicts UBS's actual business practices.

"The aforementioned legal document," he writes, "which professed to outline what business practices were forbidden by UBS, ran directly contrary to the actual UBS business practices which were actively encouraged by UBS senior management." He wrote that he was "extremely concerned by its implications."

According to a Senate subcommittee report, the legal document in question tells UBS private bankers that although the bank is licensed as a bank and broker-dealer in the United States, the licenses do not apply to UBS offices or affiliates outside the United States that provide banking or securities services to Americans.

The services now under scrutiny were provided by UBS units outside the United States.

In his letter, Mr. Birkenfeld says that in June 2005, he wrote to a UBS compliance officer, Philipp Frey, and others, asking them to explain what the legal document meant "I received no responses of any kind," Mr. Birkenfeld wrote.

Mr. Birkenfeld's March 17 letter was copied to Martin Liechti, UBS's senior private banker for American clients with offshore accounts. Mr. Liechti was detained in Florida by authorities in April, but has returned to Switzerland.

Four days later, on March 21, 2006, Mr. Kurer wrote to Mr. Birkenfeld to say that an in-house lawyer, Bernhard Schmid, would investigate the allegations. Mr. Kurer's letter was copied to Mr. Rohner and others.

Five days later, on March 26, 2006, Mr. Birkenfeld thanked Mr. Kurer for his actions in a letter copied to 16 senior UBS executives, including Mr. Rohner and Lawrence A. Weinbach. Mr. Weinbach is a member of the board's audit committee.

Two months later, on May 24, 2006, Mr. Kurer wrote to Mr. Birkenfeld to say that the bank had completed an internal investigation of his claims.

Mr. Kurer wrote that he was "reviewing the results and formulating a number of recommendations to management" that aimed "at improving the existing policy" as well as "training and monitoring." The letter was copied to Mr. Rohner and Mr.

Weinbach. Mr. Kurer added that a dispute with Mr. Birkenfeld over a bonus would be resolved.

Danny C. Onorato, a lawyer for Mr. Birkenfeld at Schertler & Onorato in Washington, said that "it is clear that Mr. Birkenfeld on numerous occasions told UBS and the higher-ups at UBS of its improper practices. Unfortunately, his notifications fell on deaf ears." Mr. Onorato declined to comment further.

UBS said on Wednesday that the May 24, 2006, letter "was just one step in dealing with the complaints raised by Mr. Birkenfeld. Management was copied on this letter to further demonstrate to Mr. Birkenfeld the seriousness with which the complaints were being treated."

(Emphasis added.)

252.    On this news, UBS shares fell 4.24% from $20.30 to $19.44.

253.    On August 14, 2008, UBS filed with the SEC its quarterly report for the second quarter of 2008 on Form 6-K. Defendant Rohner signed the report. In the report, Defendants reported operating income for the three months ending June 30, 2008 of CHF 4.021 billion, net profit (loss) of CHF (358) million and diluted earnings (loss) per share of CHF (0.17).

254.    Regarding the Wealth Management segment, the Company stated, in relevant part:

> Changes to US cross-border banking and brokerage services
>
> In November 2007, UBS started to redefine its cross-border operations for US private clients. In July of this year, UBS announced it will entirely exit this business and cease to offer cross-border banking and brokerage services to US customers from entities other than US-registered broker dealers. However, clients will still have access to the same services through Wealth Management US's SEC-registered domestic broker dealer or its other SEC-registered units based in Switzerland and Hong Kong. US-domiciled private clients holding securities and banking accounts with UBS outside the US, and all legal structures whose beneficial owner ultimately is a US individual, will be asked to transfer their relationship to these units within the next 12 to 24 months. Relationships with clients who do not want to be serviced by one of these units will be ended in an orderly fashion within a targeted timeframe of 24 months.

255.    On September 17, 2008, Birkenfeld's former client, Igor Olenicoff ("Olenicoff") sued UBS alleging the Company had deceived him about the legality of keeping $200 million of his funds in undeclared Swiss accounts.

256.    On this news, UBS stock declined 15% to close at $13.14 on heavy volume of 21.5 million shares.

257.    On November 4, 2008, UBS issued a press release and filed its quarterly report for the third quarter of 2008 with the SEC on Form 6-K. In the report and press release, Defendants recorded operating income for the three months ending September 30, 2008 of CHF 5.556 billion, net profit of CHF 296 million and diluted EPS of CHF 0.09

258.    Regarding the Company's cross-border private banking services, Defendants stated, in relevant part:

> US Cross-Border: UBS AG has been responding to a number of governmental inquiries and investigations relating to its cross-border private banking services to US private clients during the years 2000-2007. In particular, the US Department of Justice ("DOJ") is examining whether certain US clients sought, with the assistance of UBS client advisors, to evade their US tax obligations by avoiding restrictions on their securities investments imposed by the Qualified Intermediary agreement ("QIA") UBS entered into with the US Internal Revenue Service ("IRS") in 2001. DOJ and IRS are also examining whether UBS AG has been compliant with withholding obligations in relation to sales of non-US securities under the so-called Deemed Sales and Paid In US tax regulations. In connection with DOJ's investigation, a senior UBS employee was detained by US authorities as a "material witness." In August, after his status as a witness had been resolved, the senior employee returned to Switzerland. On 19 June 2008, a former UBS AG client advisor pleaded guilty to one count of conspiracy to defraud the United States and the IRS in connection with providing investment and other services to a US person who is alleged to have evaded US income taxes on income earned on assets maintained in, among other places, a former UBS AG account in Switzerland. The sentencing hearing is currently scheduled for 8 January 2009. The IRS has submitted legal and administrative assistance requests seeking information relating to US clients of UBS AG to the competent Swiss authorities. UBS is addressing these requests with both Swiss and US government authorities within the legal

framework for intergovernmental cooperation and assistance established between Switzerland and the US. The IRS has also issued a civil summons and the District Attorney for the County of New York has issued a request for information located in the US concerning UBS's cross-border business, including any information located in the US relating to clients of that business. Further, the IRS has delivered to UBS AG a notice concerning alleged violations of the QIA which UBS is responding to under the applicable cure process. The SEC is examining whether Swiss-based UBS client advisors engaged in activities in relation to their US domiciled clients that triggered an obligation for UBS Switzerland to register with the SEC as a broker-dealer and / or investment adviser. Finally, the Swiss Federal Banking Commission is investigating UBS's cross-border servicing of US private clients under Swiss Banking Supervisory legislation. The investigations are also focused on the management supervision and control of the US cross-border business and the practices at issue. UBS has been working to respond in an appropriate and responsible manner to all of these investigations in an effort to achieve a satisfactory resolution of these matters. As announced on 17 July 2008, UBS will no longer provide securities and banking services to US resident private clients (including non-operating entities with US beneficiaries) except through its SEC-registered affiliates. In addition, UBS is implementing steps to strengthen its overall Qualified Intermediary compliance framework.

259.   On November 6, 2008, a federal grand jury in the Southern District of Florida indicted Defendant Weil on conspiracy to commit tax fraud. In the indictment, prosecutors alleged that Weil conspired with other UBS executives who "occupied positions at the highest levels of management within [UBS], including positions on the committees that oversaw legal, compliance, tax, risk, and regulatory issues related to the United States cross-border business."

260.   The indictment alleges that Weil and other UBS executives represented that the Company was in compliance with the terms of its QI agreement with the knowledge that its U.S. cross-border business was not conducted in a manner which complied with the agreement. According to the indictment, Weil and other UBS Executives referred to the U.S. cross border business as "toxic waste" because they knew it was illegal, but, despite this knowledge, placed monetary incentives which encouraged further abuses.

261.   The indictment states that in or about August 2006, Weil and another executive refused to follow the recommendations of two UBS managers to wind down, sell, or spin off the U.S. cross-border business, because it would be too costly and would require public disclosures that would harm UBS.

262.   On these disclosures, UBS shares declined 9%, closing at $14.51.

263.   On November 12, 2008, UBS reported that Defendant Weil, the head of the Company's Global Wealth Management and Business Banking unit, had been indicted by a federal grand jury in connection with a DOJ investigation into the Company's practices. The press release stated, in relevant part:

> Statement On Indictment Of UBS Executive
>
> Zurich/New York, 12 November 2008 -UBS confirmed today that Raoul Weil, Chairman and CEO of UBS Global Wealth Management and Business Banking and a member of the Group Executive Board, has been indicted by a Federal grand jury sitting in the Southern District of Florida in connection with the ongoing investigation of UBS's US cross-border business by the United States Department of Justice. Raoul Weil was previously head of UBS Wealth Management International from 2002 to 2007.
>
> Mr. Weil has determined that, in the interest of the firm and its clients, and in order to defend himself, he will relinquish his duties at this time pending the resolution of this matter. On an interim basis, Marten Hoekstra, currently Deputy CEO of Global Wealth Management & Business Banking and Head of Wealth Management US, will assume Mr. Weil's duties.
>
> As announced on July 17, 2008, UBS will cease providing cross-border private banking services to US-domiciled clients through its non-US regulated units. UBS is fully committed to continuing its efforts to cooperate with the investigation of its US cross-border business and to working in a responsible manner with all relevant authorities towards a satisfactory resolution of this matter.

264.   On this news, shares of UBS common stock declined $0.65, closing at $13.12.

265.    On January 26, 2009, The *Wall Street Journal* published an article entitled "U.S. Tax Case Against UBS Grows Wider; Talks to Settle." In this article, the full nature of the U.S. investigation into UBS was revealed.

> UBS AG is under legal pressure as U.S. prosecutors expand their investigation into whether the Swiss bank helped tens of thousands of Americans avoid paying taxes, said several people involved in the case.
>
> U.S. tax investigators believe the number of American clients that UBS helped to avoid taxes could be much higher than the previously disclosed estimate of about 17,000, these people said. The people said investigators are also looking into whether other parts of the bank besides the wealth-management unit were involved in helping clients avoid U.S. taxes.
>
> The bank is in a round of talks with the Justice Department to avert a possible felony indictment by admitting to criminal conduct and paying a penalty in the range of $1.2 billion, these people said.
>
> UBS has publicly denied any wrongdoing, and a bank spokesman said the bank "does not comment on...speculative matters." A Justice Department representative also declined to comment.
>
> *          *          *
>
> Federal investigators have recently found evidence of thousands of additional, previously unknown accounts at UBS that they believe are held by Americans, people with knowledge of the inquiry said. Prosecutors are also exploring whether UBS may have sought to help wealthy investors avoid taxes in other ways.

266.    On this news UBS shares slumped to close at $12.26. Overall, from the May 6th disclosure of the DOJ investigation into the Company's cross-border services until the end of the Class Period, UBS shares declined $21.51, or 64%,  as new information regarding the vastness of the Company's fraudulent enterprise disseminated into the market.

## LOSS CAUSATION/ECONOMIC LOSS

267.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of UBS's securities and operated as a fraud or deceit on Class Period purchasers of UBS'

securities by failing to disclose to investors that a significant proportion of the Company's NNM performance indicator and reported revenues therefrom were fraudulently obtained fees derived from the Company's illegal tax evasion scheme. When Defendants' prior misrepresentations and fraudulent conduct were disclosed in a series of partial disclosures, and disseminated into the market, the prices of UBS's securities declined steadily as the prior artificial inflation came out. As a result of their purchases of UBS's securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

268.   By failing to disclose to investors that the Company's financial performance was the result of improper and illegal conduct engaged in by Defendants, investors did not know that the Company's future prospects would be bleak and the Company would be subject to future governmental scrutiny. Therefore, Defendants presented a misleading picture of UBS's business and prospects. Thus, instead of truthfully disclosing during the Class Period the true risks to which UBS was exposed, Defendants caused UBS to conceal the truth.

269.   Defendants' false and misleading statements had the intended effect and caused UBS's common stock to trade at artificially inflated levels throughout the Class Period, reaching a high of $65.56 on April 25, 2007.

270.   As a direct result of Defendants' disclosures and/or news reports on May 6, 2008, May 13, 2008, May 27, 2008, June 19, 2008, September 17, 2008, November 6, 2008, November 12, 2008, and January 26, 2009, UBS's common stock price declined on heavy trading volume. These drops removed the inflation from the price of UBS's securities, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

271.   From May 6, 2008 through January 26, 2009, UBS stock lost 64% of its value and was substantially impacted by the nature and extent of Defendants' fraud finally being revealed to investors and the market.

272.    The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of UBS's securities and the subsequent significant decline in the value of UBS's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

273.    At all relevant times, the market for UBS's securities was an efficient market for the following reasons, among others:

(a)    UBS's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, UBS filed periodic public reports with the SEC and the NYSE;

(c)    UBS regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    UBS was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

274.    As a result of the foregoing, the markets for UBS's securities promptly digested current information regarding UBS from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of UBS's securities during the Class Period suffered similar injury through their

105

purchase of UBS's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

275.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of UBS who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against UBS and the Individual Defendants

276.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

277.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding UBS's business, operations and management and the intrinsic value of UBS securities; and (ii) caused Plaintiff and members of the Class to purchase UBS's publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

278.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UBS securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

279.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of UBS as specified herein.

280.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of UBS's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about UBS and its business operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of UBS securities during the Class Period.

281.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof, (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company

was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they hew or recklessly disregarded was materially false and misleading.

282.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing UBS's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

283.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of UBS securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of UBS's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not

disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired UBS securities during the Class Period at artificially high prices and were damaged thereby.

284.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding UBS's financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired UBS securities, or, if it had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

285.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule l0b-5 promulgated thereunder.

286.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

287.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

288.    The Individual Defendants acted as controlling persons of UBS within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and

control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

289.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

290.    As set forth above, UBS and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT III
### Violation of Section 11 of the 1933 Act Against Defendants UBS, Ospel, Rohner, Suter, Haeringer, Bertarelli, Kaufmann-Kohler, Marchionne, Meyer, Panke, Spuhler, Voser, Weinbach, and Wolle

291.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

292.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class.

293.    This Count does not sound in fraud.  All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

294. The Registration Statement for the Rights Offering was inaccurate and contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

295. UBS is the registrant for the Rights Offering. The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.

296. As issuer of the shares, UBS is strictly liable to Plaintiff and the Class for the misstatements and omissions.

297. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

298. By reason of the conduct herein alleged, each Defendant named in this Count violated, and/or controlled a person who violated, §11 of the 1933 Act.

299. Plaintiff acquired UBS common stock pursuant and/or traceable to the Registration Statement for the Rights Offering.

300. The Plaintiff has sustained damages. The value of UBS common stock has declined substantially subsequent to and due to the violations of Defendants named in this Count.

301. At the time of their purchases of UBS common stock pursuant and/or traceable to the Registration Statement, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to January 26, 2009. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed this Complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

**COUNT IV**

**Violation of Section 12 of the 1934 Act Against Defendants UBS, Ospel, Rohner, Suter, Haeringer, Bertarelli, Kaufmann-Kohler, Marchionne, Meyer, Panke, Spuhler, Voser, Weinbach, and Wolle**

302.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

303.    Defendants named in this Count were sellers and offerors and/or solicitors of purchasers of the UBS common shares offered pursuant to the Rights Offering.  Defendants issued, caused to be issued, and signed the Registration Statement in connection with the Rights Offering.  The Registration Statement was used to induce investors, such as Plaintiff and the other members of the Class, to purchase UBS common shares.

304.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.  The acts of Defendants named in this Count of solicitation included participating in the preparation of the false and misleading Registration Statement.

305.    As set forth more specifically above, the Registration Statement contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

306.    Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement.

307.    The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete

in all material respects. Had they done so, these Defendants named in this Count could have known of the material misstatements and omissions alleged herein.

308. This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years after UBS common shares were sold to the Class in connection with the Rights Offering.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 10, 2009

Respectfully submitted,
SCOTT+SCOTT LLP

JOSEPH P. GUGLIELMO (JG 2447)
29 West 57th Street, 14th Floor
New York, NY 10019
Telephone: (212) 223-6444
Fax: (212) 223-6334
Email: jguglielmo@scott-scott.com

DAVID R. SCOTT (DS 8053)
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Telephone (860) 537-5537
Fax: (860) 537-4432
Email: drscott@scott-scott.com

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Walter Stampor, on behalf of the Police and Fire Retirement System of the City of Detroit ("Detroit P&F"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.   I am the Executive Secretary of Detroit P&F. I have reviewed the complaint in this matter and authorize Scott + Scott LLP to file it on behalf of Detroit P&F and all other similarly situated.

2.   Detroit P&F did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.   Detroit P&F is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Detroit P&F fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.   Detroit P&F's transactions in UBS AG (UBS) securities that are the subject of this action are set forth in the chart attached hereto.

5.   Detroit P&F has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Bausch & Lomb, Inc. Securities Litigation*, Case No. 06-cv-6294 (W.D.N.Y.)
*In re KLA-Tencor Corp. Securities Litigation*, Case No. 06-cv-4065 (N.D. Cal.)
*Police and Fire Retirement System of the City of Detroit v. Safenet Inc., et al.*, Case No 06-cv-5797 (S.D N.Y)
*In re Marvell Technology Group, Ltd. Securities Litigation*, Case No. 06-cv-6286 (N.D. Cal.)
*In re WSB Financial Group Securities Litigation*, Case No. 07-cv-1747 (W.D. Wash.)
*In re SiRF Technology Holdings, Inc. Securities Litigation*, Case No. 08-cv-856 (N.D. Cal.)

6.   Detroit P&F has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

*In re Aetna, Inc. Securities Litigation*, Case No. 07-cv-4451 (E.D. Pa.)
*In re Verifone Holdings, Inc. Securities Litigation*, Case No. 07-cv-6140 (N.D. Cal.)
*In re UBS AG Securities Litigation*, Case No. 07-cv-11225 (S.D.N.Y.)
*Barkett v. Societe Generale et al.*, Case No. 08-cv-2495 (S.D.N.Y.)
*In re Gildan Activewear Inc. Securities Litigation*, Case No. 08-cv-05048-HB (S.D.N.Y.)

1

7.     Detroit P&F will not accept any payment for serving as a representative party on behalf of the Class beyond Detroit P&F's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _5_ day of March, 2009.

Walter Stampor
Executive Secretary
*Police and Fire Retirement System of the City of Detroit*

2

## POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT
### UBS AG PLAINTIFF CERTIFICATION ATTACHMENT

*Transactions in UBS AG During Class Period of May 4, 2004 – January 26, 2009*

| Trade Date | Transaction | Number of Shares | Price Per Share |
| --- | --- | --- | --- |
| 12/15/06 | Sell | 1,860 | $61.296 |
| 02/08/07 | Buy | 19,595 | $78.821 |
| 02/08/07 | Buy | 10,382 | $79.568 |
| 02/09/07 | Buy | 2,422 | $79.922 |
| 02/09/07 | Buy | 2,802 | $80.439 |
| 02/22/07 | Buy | 14,281 | $76.731 |
| 02/23/07 | Sell | 3,456 | $76.117 |
| 02/26/07 | Buy | 3,169 | $75.694 |
| 04/17/07 | Buy | 10,285 | $75.908 |
| 04/25/07 | Sell | 6,052 | $77.942 |
| 04/27/07 | Buy | 6,030 | $75.447 |
| 04/30/07 | Buy | 5,110 | $75.447 |
| 05/02/07 | Sell | 6,030 | $78.55 |
| 05/02/07 | Sell | 3,300 | $64.625 |
| 05/03/07 | Sell | 1,810 | $62.566 |
| 05/04/07 | Buy | 1,910 | $63.601 |
| 05/29/07 | Buy | 277 | $79.275 |
| 05/29/07 | Buy | 10,014 | $79.322 |
| 12/11/07 | Sell | 12,967 | $56.9452 |
| 05/19/08 | Buy | 1,260 | $40.553 |
| 06/02/08 | Buy | 7,720 | $22.88 |
| 06/03/08 | Buy | 1,415 | $24.288 |
| 06/04/08 | Buy | 5,765 | $24.9574 |
| 06/04/08 | Buy | 5,317 | $24.996 |
| 06/05/08 | Buy | 5,286 | $24.9068 |
| 06/05/08 | Buy | 16,880 | $26.00 |
| 06/09/08 | Buy | 8,844 | $24.0746 |
| 06/13/08 | Buy | 4,219 | $24.7643 |
| 06/13/08 | Buy | 1,752 | $24.6488 |
| 06/19/08 | Buy | 4,095 | $20.15 |
| 06/19/08 | Sell | 4,095 | $22.43 |
| 06/20/08 | Buy | 4,802 | $20.15 |
| 06/25/08 | Buy | 8,635 | $23.6407 |
| 06/30/08 | Buy | 7,229 | $21.3216 |
| 07/01/08 | Buy | 24,281 | $20.224 |
| 07/03/08 | Buy | 2,749 | $20.4969 |
| 07/03/08 | Buy | 3,191 | $20.3479 |
| 07/07/08 | Buy | 12,711 | $19.8875 |
| 07/10/08 | Sell | 9,536 | $20.5637 |
| 07/16/08 | Buy | 6,665 | $17.8228 |
| 07/21/08 | Sell | 19,501 | $22.4763 |
| 07/24/08 | Sell | 2,381 | $23.73 |
| 08/04/08 | Buy | 6,331 | $19.5595 |
| 08/05/08 | Buy | 23,417 | $20.9157 |

CONTINUED...

**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**
**UBS AG PLAINTIFF CERTIFICATION ATTACHMENT CONTD.**

*Transactions in UBS AG During Class Period of May 4, 2004 – January 26, 2009*

| Trade Date | Transaction | Number of Shares | Price Per Share |
|---|---|---|---|
| 08/07/08 | Buy | 8,314 | $22.764 |
| 08/14/08 | Sell | 11,462 | $21.6795 |
| 09/15/08 | Sell | 11,970 | $19.5348 |
| 09/15/08 | Sell | 12,419 | $19.226 |
| 09/15/08 | Sell | 11,181 | $20.94 |
| 09/16/08 | Buy | 10,617 | $16.2485 |
| 09/17/08 | Sell | 18,317 | $17.6826 |
| 09/18/08 | Buy | 26,335 | $17.3526 |
| 09/19/08 | Sell | 10,594 | $20.1803 |
| 09/23/08 | Buy | 5,823 | $19.436 |
| 09/26/08 | Buy | 5,851 | $20.4806 |
| 10/03/08 | Sell | 18,529 | $22.7414 |
| 10/03/08 | Sell | 8,965 | $23.4695 |
| 10/06/08 | Buy | 6,435 | $20.4856 |
| 10/07/08 | Buy | 4,714 | $19.7415 |
| 10/07/08 | Buy | 3,503 | $20.4490 |
| 10/08/08 | Buy | 5,043 | $18.5535 |
| 10/10/08 | Buy | 5,222 | $17.95 |
| 10/17/08 | Buy | 4,386 | $18.4254 |
| 10/17/08 | Buy | 4,386 | $18.4254 |
| 11/11/08 | Sell | 5,075 | $16.2591 |
| 11/11/08 | Sell | 5,413 | $16.5151 |
| 11/20/08 | Buy | 10,655 | $10.9756 |
| 11/25/08 | Sell | 10,475 | $14.9261 |
| 12/04/08 | Sell | 4,053 | $14.8079 |
| 12/05/08 | Sell | 1,487 | $14.1928 |
| 12/08/08 | Sell | 5,137 | $15.129 |
| 12/09/08 | Sell | 5,166 | $15.7078 |
| 12/12/08 | Sell | 10,735 | $14.5348 |
| 01/09/09 | Sell | 4,797 | $16.8574 |
| 01/09/09 | Buy | 4,068 | $16.5985 |
| 01/12/09 | Buy | 3,408 | $15.934 |
| 01/14/09 | Buy | 5,743 | $13.8688 |